**CONGRESSIONAL NEWS SYNDICATE,**
Plaintiff,

v.

**UNITED STATES DEPARTMENT OF JUSTICE et al., Defendants.**

Civ. A. No. 77–0882.

United States District Court,
District of Columbia,
Civil Division.

Oct. 13, 1977.

Leonard B. Terr, Washington, D. C., for plaintiff.

Barbara L. Ward, Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (Supp. V 1975), to compel disclosure of certain materials alleged to have been obtained or compiled by the Watergate Special Prosecution Force ("WSPF") in the course of one of its numerous investigations. The parties' cross-motions for summary judgment are directed to the issue whether the materials in question are within the purview of Exemption 7(C) of FOIA, which provides that FOIA disclosure requirements do not apply to investigatory records compiled for law enforcement purposes if production of the records would constitute an unwarranted invasion of personal privacy. 5 U.S.C. § 552(b)(7)(C).

To prevail on its motion for summary judgment, a party must demonstrate that the absence of any genuine issue of material fact entitles it to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Bloomgarden v. Coyer*, 156 U.S.App.D.C. 109, 116, 479 F.2d 201, 208 (1973). Issues of fact are to be construed in the light most favorable to the other party. *Semaan v. Mumford*, 118 U.S. App.D.C. 282, 283 n. 2, 335 F.2d 704, 705 n. 2 (1964).

### A. BACKGROUND.

The Watergate Special Prosecution Force was created pursuant to the Attorney General's statutory power to appoint officers to conduct special investigations. 28 U.S.C. §§ 515, 533 (1970). The WSPF functioned as a unit within the Department of Justice, its duties and responsibilities having been "carved out of the area of responsibility previously assigned to the Assistant Attorney General in charge of the Criminal Division." *United States v. Andreas*, 374 F.Supp. 402, 412 (D.Minn.1974); 28 C.F.R. § 0.1, 0.37–.38 (1976); *see also id.*, Appendix to Subpart G–1 (defining special prosecutor's duties and responsibilities). Before its termination June 20, 1977, the WSPF conducted numerous investigations, including one of a secret program, allegedly sponsored by the White House, for raising and

disbursing funds to certain Republican candidates in the 1970 Congressional elections. Affidavit of Charles F. C. Ruff, former Watergate Special Prosecutor, at 3 (July 7, 1977) [hereinafter "Ruff Affidavit"]; *id.*, Exh. A (comprising portions of Watergate Special Prosecution Force Report) [hereinafter "WSPF Report"]. Nicknamed the "Townhouse Operation" because of its headquarters in a Washington, D.C. townhouse, the operation ultimately raised and disbursed about three million dollars, forwarded in the form of checks from contributors, and distributed to particular campaign committees according to directions from members of the White House staff. WSPF Report, at 79. The details of the operation came to light when WSPF investigators interviewed Jack Gleason, a former White House aide who both arranged to receive contributors' checks and forwarded them to campaigns. *Id.* Gleason supplied the WSPF with records revealing the operation in full detail. *Id.* The WSPF concluded that the Townhouse Operation constituted a political committee operating in violation of those provisions of the Federal Corrupt Practices Act requiring such committees to file financial reports and elect officers. *Id.*; *see* Federal Corrupt Practices Act, c. 368, tit. III, §§ 302(c), 303–04, 43 Stat. 1070–73 (1925), *repealed*, Pub.L. No. 92–225, tit. IV, § 405, 86 Stat. 20 (1972) (current version at 2 U.S.C.A. §§ 431(c), 432, 434 (Cum.Supp. 1977)). Gleason, Harry Dent, Gleason's White House contact, and Herbert Kalmbach, a fundraiser for the operation, all pleaded guilty to violations of the Federal Corrupt Practices Act. WSPF Report, at 79; Ruff Affidavit, at 3. WSPF prosecutors considered the possible criminal liability of others involved in the Townhouse Operation, including contributors and recipients of the funds in question, but none was prosecuted. *Id.*

In an April 14, 1977 letter to Charles F. C. Ruff, Watergate Special Prosecutor at that time, Ken Cummins of the Congressional News Syndicate submitted a FOIA request for WSPF records relating to the Townhouse Operation. *See* Plaintiff's Cross-Motion for Summary Judgment, Exh. 1. The Congressional News Syndicate (CNS) "is an independent news-gathering organization incorporated in the District of Columbia and composed of a number of free-lance journalists and writers." Affidavit of Lewis Perdue, CNS Board Member, at 1 (July 25, 1977). The request in general was directed to "information concerning the roles of Robert J. Conkling and Jack Gleason in the 1970 'Townhouse' illegal fundraising operation." Letter from Ken Cummins to Charles F. C. Ruff. The letter identifies Conkling as one of those involved in the operation whom the WSPF investigated but never prosecuted. The specific material requested falls into two categories: first, "the records outlining the contributions made to the secret project and the expenditures of the Townhouse operation," and second, material relating to the alleged investigation of Conkling as a possible participant in the Townhouse Operation for purposes of potential criminal liability. *Id.*[1]

Special Prosecutor Ruff responded to the CNS request by letter dated April 28, 1977, denying both facets of plaintiff's request. The denial as to records of contributions and expenditures was premised on three grounds:

(1) That the identities of contributors and recipients are exempt from disclosure under FOIA Exemption 7(C) because production would constitute an unwarranted invasion of privacy and subject the individuals concerned to "public ridicule or embarrassment";

---

1. Perhaps because details of Mr. Gleason's role are public knowledge, plaintiff's request apparently does not extend to any materials on the WSPF's investigation into Gleason's role. The WSPF response to CNS' request did not treat the request as extending to Gleason. Letter from Charles F. C. Ruff, Watergate Special Prosecutor, to Ken Cummins, Congressional News Syndicate (April 28, 1977). Thus, even if plaintiff's request were construed as extending to Gleason, plaintiff has not received the agency denial of access necessary to the institution of a civil action. 5 U.S.C. § 552(a)(4)(B).

(2) That, during the plea-bargaining process, the Government made assurances that the identities of recipients and contributors would be released only in the context of a formal judicial proceeding initiated by the WSPF; and

(3) That disclosure of certain White House documents relating to the identity of contributors and recipients would violate the terms of an order of this Court.

In its pleadings, the Government has pressed only the first of these grounds as a basis for nondisclosure.

As to the request for material covering the WSPF probe into Conkling's involvement, the letter declined to confirm or deny the existence of such material, citing the WSPF policy of requiring a notarized authorization from the subject of the alleged investigation before responding to FOIA requests. Letter from Charles F. C. Ruff, Watergate Special Prosecutor, to Ken Cummins, CNS, at 2 (April 28, 1977). Such authorization does not appear from the record.

The letter closed by informing CNS of its right to challenge the denial of access by an action to compel production of the requested material, 5 U.S.C. § 552(a)(4)(B), there being no right of administrative appeal from the Special Prosecutor's denial of a FOIA request.

There appear no procedural impediments, in the way of failure to exhaust administrative remedies, or lack of standing or ripeness, to consideration of this matter on its merits.

B. *FOIA EXEMPTION 7(C).*

■ The sole question presented by the cross-motions is whether the FOIA mandates production of the materials requested, or any segregable portion thereof. The Government's argument for withholding the material rests upon one exemption only, i. e., that which governs "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (Supp. V 1975). The operative phrase, "unwarranted invasion of privacy," entered the Act by way of 1974 amendments intended to counteract judicial expansion of the investigatory files exemption. Freedom of Information Act and Amendments of 1974, Pub.L. No. 93–502, § 2(b), 88 Stat. 1563; *see* 120 Cong.Rec. S9336 (remarks of Sen. Hart). The language of FOIA Exemption 7(C) parallels that of Exemption 6, covering "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1970). Originally, Exemption 7(C) repeated the "clearly unwarranted" standard of Exemption 6, but the conferees on the 1974 amendments agreed to delete the word "clearly" in response to a Presidential request. *See* Letter from President Gerald R. Ford to Sen. Edward M. Kennedy (Aug. 20, 1974), *reprinted in Freedom of Information Act and Amendments of 1974 (P.L. 93–502) Source Book: Legislative History, Texts, and Other Documents* 368–70; Letter from Sen. Edward M. Kennedy, Chairman, Senate Conferees, and Rep. William S. Moorhead, Chairman, House Conferees, to President Gerald R. Ford (Sept. 23, 1974), *reprinted in Source Book, supra,* at 370–72. The difference in wording between the two exemptions was advised and not accidental; its effect is to make Exemption 7(C) a somewhat broader shield against disclosure than Exemption 6. *See Department of the Air Force v. Rose,* 425 U.S. 352, 378–79, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1975). The difference in breadth, in turn, is attributable to the inherent distinctions between investigatory files and personnel, medical and similar files: that an individual's name appears in files of the latter kind, without more, will probably not engender comment and speculation, while, as the Government argues here, an individual whose name surfaces in connection with an investigation may, without more, become the subject of rumor and innuendo. Defendants' Memorandum in Support of their Motion for Summary Judgment, at 6–7 (hereinafter defendants' Memorandum).

■ Despite this difference in breadth, the two exemptions are to be applied according to the same standard, a *de novo* balancing test, weighing the privacy interest and the extent of the invasion thereof against the public interest in disclosure, and "tilt[ing] the balance in favor of disclosure." *Getman v. N.L.R.B.*, 146 U.S.App.D.C. 209, 213, 450 F.2d 670, 674 (1971) (Exemption 6).[2] Another variable to be weighed is the degree to which the requesting party could obtain the material sought from an alternate source. *Rural Housing Alliance v. U. S. Dep't of Agriculture*, 162 U.S.App.D.C. 122, 127, 498 F.2d 73, 78 (1974).

## C. INFORMATION ON RECIPIENTS AND CONTRIBUTORS.

The affidavit of former Special Prosecutor Ruff describes the material on contributors and recipients of Townhouse Operation funds as follows:

"12. The documents relating to contributors and recipients consist of accounting ledger sheets. With regard to contributors, the names of the contributor [sic] is listed, together with an amount, or if payments were made to normal political committees, the names of the committee and the amount of the contribution is listed. With regard to recipients, who are listed by state, the date of delivery, the names of the actual recipient and the name of the political committee of a candidate with whom he is associated and the amount are listed.

"13. The political committees referred to in paragraph 12 are named political committees of specific candidates and not general committees such as the Republican National Committee or the Republican Congressional Campaign Committee."

Ruff Affidavit at 4.

■ A question the parties appear not to have considered is whether the ledger sheets constitute "investigatory records compiled for law enforcement purposes" within the language of Exemption 7(C). If the ledger sheets were prepared by WSPF personnel on the basis of evidence unearthed in the course of the investigation of the Townhouse Operation, they clearly fall within the terms of the exemption. If, on the other hand, the ledger sheets, as appears to be the case, were compiled by Townhouse Operation participants in furtherance of their secret fundraising process, the exemption's application is much less clear. *See generally Rural Housing Alliance, supra*, 162 U.S.App.D.C. at 130, 498 F.2d at 81; *Center for National Policy Review v. Weinberger*, 163 U.S.App.D.C. 368, 370–71, 502 F.2d 370, 373–74 (1974). Despite the legislative directive that the exemption be construed narrowly, to read the statutory language as extending the exemption only to material actually prepared by the investigating authority would be to eviscerate the exemption. It is sufficient that the ledger sheets in question became a part of the WSPF files in the course of the criminal investigation into the Townhouse Operation.

The first step in the balancing process entails a determination of the privacy interest at stake and the extent of the invasion thereof. *Rural Housing Alliance, supra*, 162 U.S.App.D.C. at 127, 498 F.2d at 78. Defendants characterize the CNS request as implicating "the most sensitive area of an individual's life—his reputation." Defendant's Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment at 5 (hereinafter Defendants' Opposi-

2. Two issues which have concerned other courts applying the balancing test are not significant here. The first is whether the public interest in disclosure is to be viewed narrowly in terms of the use to which the requesting party would put the information, or broadly in terms of the general public interests served in the abstract by disclosure. *See Ditlow v. Shultz*, 170 U.S.App.D.C. 352, 356–57, 517 F.2d 166, 170–71 (1975); *Disabled Officers' Ass'n v. Rumsfeld*, 428 F.Supp. 454, 457 (D.D.C.1977).

Because disclosure to plaintiff CNS would presumably be tantamount to unrestricted public disclosure, the issue does not arise. The second issue is whether a privacy interest must be of sufficient magnitude before the balancing test is triggered. *Ditlow, supra*, 170 U.S.App. D.C. at 356, 517 F.2d at 170; *Tennessean Newspaper, Inc. v. Levi*, 403 F.Supp. 1318, 1321 (M.D.Tenn.1975). Here, too, the magnitude of the privacy interests at stake obviates consideration of the latter question.

tion). They point out that none of the individuals whose identities would be disclosed was charged with any crime in connection with the Townhouse Operation. *Id.* at 6; Ruff Affidavit at 3. At bottom, the Government's argument rests on the opprobrium that allegedly attaches to anyone whose name is linked with the Watergate investigation:

> "The aura of Watergate is such that any connection of an individual to a Watergate investigation carries with it an implication of criminality and political corruption which is inescapable and which places these individuals in a position of having to defend their conduct even though not charged with any offense." Defendants' Memorandum at 6.

■ Plaintiff's argument for disclosure rests, in part, on the proposition that only information relating to "intimate details" of a "highly personal" nature merits protection under Exemption 7(C). Plaintiff's Memorandum of Points and Authorities In Support of Its Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment at 18–21. Both this argument and what might be termed the Government's "aura of Watergate" argument are flawed by overstatement; the *per se* rule implicit in each is fundamentally incompatible with a balancing standard such as that here. Thus, the fact that only names, and not "intimate details", would be disclosed is no more a reason for disclosure than the fact that the Townhouse Operation was among the widely disparate "Watergate" activities is an argument for withholding the information sought. Despite limited authority for the argument that disclosure of a "bare name and address" invades no cognizable privacy interest, *Getman v. NLRB, supra,* 146 U.S. App.D.C. at 214, 450 F.2d at 675, the context in which the information appears is determinative.

■ The information sought here appears in the context of political contributions. In the abstract, the traditional view that a citizen's politics are his own affair might be viewed as engendering a privacy interest on the part of the contributors, if not the recipients, whose quest for public office may, as plaintiff argues, render them "public figures." Plaintiff's Memorandum at 14–15; *see Nixon v. Administrator of General Services,* —— U.S. ——, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). More importantly, however, the Federal Corrupt Practices Act disclosure requirements strip contributors and recipients equally of whatever cloak of privacy their relationship would have had in the statute's absence. Federal Corrupt Practices Act, c. 368, tit. III, §§ 303–04, 43 Stat. 1071 (1925), *repealed,* Pub.L. No. 92–225, tit. IV, § 405, 86 Stat. 20 (1972) (hereinafter FCPA). The statute's requirements were unequivocal: within five days of the contribution, the recipient was required to give the committee treasurer "a detailed account thereof, including the name and address" of the contributor; the treasurer, in turn, was required to file quarterly reports disclosing, *inter alia,* the identities of contributors of more than $100 and the amount of each such contribution. *Id.* That the Act applied is not disputed: "Had the 'Townhouse' operation filed reports pursuant to the FCPA during the period of time it was in operation, the names of contributors to and recipients of funds from the operation might now be a matter of public record." Ruff Affidavit ¶ 11, at 3.[3] So far as the contributors' and recipients' privacy interest is concerned, the statute is pre-emptive. *See Philadelphia Newspapers, Inc. v. U. S. Dep't of Justice,* 405 F.Supp. 8, 11 (E.D.Pa.1975) (no invasion of privacy to disclose identities of authors of character letters to parole board because character witnesses ordinarily required to testify in court).

**3.** The affidavit's use of the conditional "might," may be meant to indicate that, for reasons not evident in the record, the Townhouse Operation would not have been required to report the identities of contributors and recipients and the amounts of contributions. Whether the Act's requirements actually would have applied is not the point; what is crucial is the Act's status as an articulation of the overriding public interest in the integrity of the process by which political campaign contributions are made and received.

The counterweight in the balance is the public interest served by disclosure. In this case, the public interest stems from two sources: first, the FCPA, which in this context amounts to a Congressional pronouncement that the circumstances surrounding campaign contributions are *per se* matters of public concern; second, the "Townhouse Operation" itself, to the extent that it entailed what later was determined to be criminal conduct on the part of holders of the public trust. In another case involving alleged misconduct on the part of members of the White House staff, the court noted "the obvious public interest in a full and thorough airing of the serious abuses that did in fact occur, in the hope that such abuses will not occur in the future." *Tax Reform Research Group v. IRS*, 419 F.Supp. 415, 418 (D.D.C.1976).

The final element of the balance, the availability of the requested materials elsewhere, must be aligned in favor of disclosure, as there has been no indication of a source other than the WSPF files.

■ In concluding as a matter of law and undisputed fact that plaintiff is entitled to the information contained in the ledger sheets, we do not depreciate the degree to which disclosure of the information may embarrass wholly innocent contributors and recipients. Nevertheless, to permit the "aura of Watergate" within which the Townhouse Operation transpired to become the basis for suppressing the details of contributions would be to exacerbate the original failure to disclose them. In the language of the exemption, whatever invasion of privacy may ensue from production of this information is not "unwarranted." The risk of such invasion was assumed by anyone making or receiving contributions reportable under the FCPA.

D. *INFORMATION ON CONKLING'S ROLE.*

The determination whether WSPF records on Robert Conkling's role in the Townhouse Operation, assuming they even exist, should be disclosed entails consideration of similar, but not identical factors. Plaintiff describes Conkling as having subleased the Washington offices of his firm, Urban Services, Inc., to Jack Gleason for use as headquarters of the Townhouse Operation. Affidavit of Lewis Perdue ¶ 7, at 4. If this is the extent of Conkling's involvement, it would appear that there is but slight public interest to be served by disclosure.

■ The prime dimensions of Conkling's privacy interest, and the extent to which disclosure would impinge upon it, cannot be exactly determined on the basis of the present record. Despite this fact, we do not believe an *in camera* inspection is necessary.

Apparently to demonstrate that Conkling has no legitimate privacy interest to be invaded, plaintiff has submitted evidence of Conkling's convictions on such charges as assault with a dangerous weapon, armed kidnapping, and armed rape, occurring prior and subsequent to the Townhouse Operation. None of these convictions has been shown to be related to the Townhouse Operation. In its initial request, plaintiff asserted that Conkling "has made himself a public figure once again by his current involvement with Tongsun Park." Letter from Ken Cummins to Charles Ruff, Watergate Special Prosecutor (Apr. 14, 1977). Though the "public personage" doctrine may apply in FOIA actions, *Tennessean Newspaper, Inc. v. Levi*, 403 F.Supp. 1318, 1321 n. 1 (M.D.Tenn.1975), it does not operate here. In *Tennessean Newspaper* the court held certain arrested and indicted persons to be "public persons" within the doctrine and ordered their identities disclosed; its determination, however, hinged on the fact that the investigation as to these individuals had reached the arrest or indictment stages, and the Justice Department's traditional practice of disseminating such information to the news media. *Id.* at 1321. Neither factor operates here. Applied to Conkling, the reasoning of *Tennessean Newspaper* renders him a "public person" only as to whatever prior convictions may be on his record; these convictions in themselves do not justify laying bare wholly unrelated areas of his life, as the Townhouse Operation.

Balanced against his privacy interest is the undeniable public interest concerning the details of an illicit political fundraising operation in which members of the White House staff participated. The policy of the FCPA applies directly to disclosure of the ledger sheets listing contributors and recipients; unlike the information on the sheets, Conkling's role in the fundraising obviously does not fall under the Act's reporting requirements. While the activities of participants in an illegal fundraising operation are matters of legitimate public concern, nondisclosure under 5 U.S.C. § 552(b)(7)(C) is permitted to the extent that production would "constitute an unwarranted invasion of personal privacy." If Conkling merely served as landlord to the Operation, as indicated in the Perdue affidavit, the public interest in disclosure of his role is minimal. If his role was more significant and he was the subject of a criminal investigation, the disclosure of such investigative records, in the absence of a criminal charge, would expose him to public embarrassment and ridicule and place him in the position of having to defend his conduct without the benefit of a formal judicial proceeding. While the grand jury analogy does not exactly fit, the disclosure of documents relating to a criminal investigation, if any, of Conkling would, in our judgment, be an "unwarranted invasion" of Conkling's privacy.

The grant of summary judgment for the plaintiff on the part of its request relating to the accounting ledger sheets and other information relating to the identities of contributors and recipients and the amounts of contributions does not necessarily mandate disclosure of all such records; some, for example, may be subject to a court order prohibiting disclosure. All documents described by this facet of plaintiff's request and not otherwise barred from disclosure should be provided to plaintiff's representatives. If the Government has grounds unrelated to FOIA Exemption 7(C) for objecting to disclosure of any such document, it should propound its objections according to the procedure formulated in *Vaughn v. Rosen*, 157 U.S.App.D.C. 340, 347–48, 484 F.2d 820, 827–28 (1973).

As to documents relating to Conkling's role in the Townhouse Operation, we hold, for the reasons previously given, that they need not be disclosed.

An Order consistent with the foregoing has been entered this day.