**COMMON CAUSE et al., Appellants,**

v.

**NATIONAL ARCHIVES AND RECORDS SERVICE.**

**No. 79–1637.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 28, 1980.

Decided April 30, 1980.

Ellen G. Block, Washington, D. C., with whom Kenneth J. Guido, Jr., Donald J. Simon, Washington, D. C., were on the brief, for appellants.

Howard S. Scher, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Acting Asst. Atty. Gen., Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before TAMM and WALD, Circuit Judges, and GASCH *, United States District Court Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (1976), Common Cause seeks from the National Archives and Records Service certain documents and memoranda compiled by the Watergate Special Prosecution Force (WSPF).[1] The documents and memoranda sought are those which reveal the identities of candidates for federal office to whom nineteen named corporations have admitted making or have been alleged to have made unlawful campaign contributions during the period 1968–73.[2]

The FOIA request filed by Common Cause was granted with respect to certain contributions of each of the corporations, for the given reason that the information had already been publicly disclosed through judicial proceedings or agency filings.[3] Information with respect to other contributions was withheld, however, because in the opinion of WSPF, disclosure "might subject the alleged recipients to embarrassment and public obloquy without the benefit of

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. On June 20, 1977, the WSPF was abolished. As a result its records were transferred to the National Archives and Record Service. Common Cause's original FOIA request was addressed to and answered by the WSPF. The district court complaint, filed before the WSPF was ended, was amended by stipulation in July, 1977 to substitute the National Archives and Records Service for the WSPF defendants originally named. References in this opinion to "defendant(s)" or "appellee(s)" should be read in light of this substitution of parties.

2. The FOIA request submitted by Common Cause seeks:

a copy of, or access to, all documents, correspondence, memoranda or other writings reflecting the identities of those candidates for Federal office who received campaign contributions from the [nineteen] corporations list-

ed above, the amounts of such contributions and the dates they were made.

At oral argument, counsel for Common Cause stated that it would be satisfied with disclosure of the relevant corporations, candidates, amounts and dates rather than disclosure of the documents and memoranda containing the information.

3. The information initially disclosed by the WSPF is reproduced at Appendix (App.) 24–35. It is compiled in tabular form, showing the identities of the corporate contributors and recipients, the amounts and dates of contributions and the (public) sources of information. After the initial disclosure, WSPF discovered that certain information not provided with respect to one corporation had already been made a matter of public record through Securities Exchange Commission filings. Accordingly, additional information (including a WSPF staff file memorandum) was disclosed. App. 36–38.

formal judicial proceedings." App. 9. Denial of access was grounded in the FOIA's exemption for law enforcement investigatory records whose disclosure would constitute an "unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C) (1976) [hereinafter 7(C)].[4]

The district court agreed with WSPF, and on motion of appellee entered summary judgment in appellee's favor on the basis of 7(C), dismissing Common Cause's complaint for declaratory and injunctive relief. After reviewing the record we find that genuine issues of material fact preclude the entry of summary judgment at this point. Accordingly, we vacate the judgment below and remand for further proceedings.

According to the original response to the Common Cause request, the information withheld derives from accounts of witnesses given in confidence upon the assurance by the WSPF "that [such] information could be provided in confidence unless needed in a formal judicial proceeding initiated by this Office [the WSPF]." App. 9. Most of the nineteen corporations with respect to which information was sought had been charged with criminal conduct under a special policy announced by the WSPF on October 17, 1973. As described in the 1975 Report of the WSPF, that policy provided that if cor-

porate officers had made voluntary disclosure of corporate contributions,

the corporation would be charged with violating Section 610 of Title 18 of the U.S. Code, which prohibits corporate contributions, and the primarily responsible corporate officer would be charged under the same statute with consenting to the making of such a contribution. The officer's cooperation in bringing the violation to WSPF's attention would be reflected in a one-count misdemeanor charge of "nonwillful" consent, as distinct from the felony of "willful" consent, and in a decision not to charge other officers or include additional counts. Variations of this pattern would be based on unusual degrees of cooperation, on obstructive conduct, or on other unique circumstances.

WSPF, Report at 73 (1975), App. 47.[5]

After filing its complaint in district court, Common Cause attempted to discover the nature of the material withheld; but this line of discovery was cut short when, pursuant to a motion filed together with the motion for summary judgment, a protective order was entered.[6]

Thus, apart from the information which was given in the original FOIA response, the only description of the materials sought which was available to appellant or to the

---

4. The WSPF response also invoked (1) the FOIA's law enforcement investigatory records exemption for materials which would "disclose the identity of a confidential source and . . . confidential information furnished only by the confidential source," 5 U.S.C. § 552(b)(7)(D) (1976), and (2) the FOIA's exemption for materials "specifically exempted from disclosure by statute," id. § 552(b)(3), on the grounds that the information was the result of grand jury testimony subject to the secrecy provisions of Rule 6(e), Fed.R.Crim.P.

The "confidential source" claim was not argued in the district court and the "grand jury testimony" claim, although argued, was not addressed in the district court's memorandum opinion. Neither claim was raised on appeal.

5. The policy (and apparently most of the investigations) covered contributions made during the period 1968–73. The Report identified the corporations and corporate officers charged after investigation and described the disposition of the charges brought. One corporation in which Common Cause was interested was not

listed in the excerpt of the Report provided the court. Of the remaining eighteen, twelve were identified as having been treated under the special lenient policy. With one exception (where there was a trial and acquittal), guilty or nolo contendere pleas were entered in each case by the corporation or an individual related to the corporation or both. App. 47–49.

6. App. 50. Plaintiff's first set of interrogatories consisted of seven questions. Three of these concerned the defendants' claim that the information requested was the product of grand jury testimony. As to these questions the motion for a protective order was denied. The remaining questions asked the number of candidates and contributions reflected in the denied documents, WSPF's source of information—whether a corporate officer or agent, paid informant, state or federal government agency, candidate-recipient or other citizen—and the dates the information was provided. App. 14–15.

court was provided by an affidavit of former Special Prosecutor Charles Ruff.[7] The affidavit, which was submitted in support of appellee's motion for summary judgment, stated:

> Documents, correspondence, memoranda or other writings in the file of the WSPF responsive to plaintiff's request but which were not provided to plaintiff originated either in grand jury proceedings or in office interviews of, or letters from, witnesses or their attorneys.

> The names of Federal candidates and the amount of the alleged contributions, in most instances, represent only the recollection of corporate officials and are unsupported and uncorporated [sic]. Similarly, the documents sought by plaintiff do not reflect whether a contribution, if, in fact, given, was received by the Federal candidate, a member of his staff or a political committee operating in his behalf.

> No federal candidate whose name appears on documents responsive to plaintiff's request has been prosecuted for the knowing receipt of a corporate contribution. Similarly, none of the information sought by plaintiff has been subjected to the scrutiny of a formal judicial proceeding.

> . . . Conduct investigated by the WSPF carries with it an aura of political corruption and criminality not otherwise attendant. The release to plaintiff of the names of Federal candidates whose names have not previously been disclosed, either in a charging instrument or in proceedings initiated by another Federal agency, may subject those individuals to public embarrassment and ridicule by linking them to a criminal investigation conducted by the WSPF with the attendant adverse inferences to be drawn therefrom when no such inferences are warranted.

> Those persons whose names are released by the prosecutor or from the prosecutor's files may be required to defend conduct for which no criminal charges have been brought and which has not been subjected to the rigors of a judicial proceeding.

> Plaintiff has been denied access to these documents on the basis of 5 U.S.C. § 552(b)(7)(C).

App. 19–20.

On the basis of this affidavit, the district court granted appellee's motion for summary judgment. Recognizing that exemption 7(C) is "to be applied using a *de novo* balancing test, weighing the privacy interest and the extent of the invasion thereto against the public interest in disclosure,"[8] the district judge nonetheless found the Ruff affidavit dispositive, concluding from it that the documents withheld were "compiled from the recollection of [corporate officials] often years after the possible contribution" and that the information they contain "has not been verified but is unsubstantiated." App. 95. Because (1) "the release of names of alleged recipients could give rise to an implication of criminality," (2) "the resulting harm to the individual could be great," and (3) "the persons involved in the present case have never been prosecuted for any . . . crime, nor will they ever be,"[9] the trial judge found that disclosure of the kinds of materials described in the Ruff affidavit would constitute an "*unwarranted invasion of personal privacy.*"

Common Cause argues, *inter alia*, that disputed areas of fact remain; principally the reliability of the information contained in the withheld documents and the likeli-

---

7. The affidavit relied both on personal knowledge and on information available to the former Special Prosecutor in his official capacity. Mr. Ruff, however, was not in the WSPF while the investigations were active, his tenure having commenced in October, 1975. App. 16.

8. App. 94, *citing Getman v. NLRB*, 450 F.2d 670 (D.C. Cir. 1971) (§ 552(b)(6)).

9. This is an apparent reference to an expired statute of limitations. Sufficient passage of time may well reduce the public interest in disclosure, but by the same token it may also reduce the strength of the privacy interest at stake.

hood of any harm to the recipients named therein. The organization contends that both factors are relevant and necessary to the court's *de novo* determination whether an "unwarranted invasion of privacy" would result from disclosure.

The government's counter-arguments boil down to a claim that disclosure of information compiled for criminal investigatory reasons which identifies persons who are not subsequently charged with crime or otherwise publicly associated with the events investigated will result in virtually every case in an "unwarranted invasion of personal privacy." [10] Relying on the Ruff affidavit, the government stresses the inconclusiveness of the information provided by witnesses in the documents at issue, asserting that it is in most instances unsupported and uncorroborated and pointing out that the documents often do not reflect whether the alleged contribution was actually received by the candidate and if so by or through whom.[11]

**10.** They also challenge the public interest in any disclosure here, given the staleness of the events surrounding the 1972 election. *But see Congressional News Syndicate v. United States Dep't of Justice*, 438 F.Supp. 538, 544 (D.D.C. 1977) (requiring disclosure of "ledger sheets" of 1970 campaign contributions):

The counterweight in the balance is the public interest·served by disclosure. In this case, the public interest stems from two sources: first, the FCPA [Federal Corrupt Practices Act], which in this context amounts to a Congressional pronouncement that the circumstances surrounding campaign contributions are *per se* matters of public concern; second, the "Townhouse Operation" itself, to the extent that it entailed what later was determined to be criminal conduct on the part of holders of the public trust. In another case involving alleged misconduct on the part of members of the White House staff, the court noted "the obvious public interest in a full and thorough airing of the serious abuses that did in fact occur, in the hope that such abuses will not occur in the future." *Tax Reform Research Group v. IRS*, 419 F.Supp. 415, 418 (D.D.C.1976).

**11.** Although the original FOIA response mentioned the privacy of informants, only the privacy of the candidate-recipients was argued in the district court and on appeal as the basis of the 7(C) claim. *See* note 2, *supra*.

At the time of the events alleged in the documents at issue, both knowing receipt of corporate campaign contributions and failure to report certain campaign contributions were unlawful. Until 1971 a congressional candidate was required to report "each contribution received by him or by any person for him with his knowledge and consent." 2 U.S.C. § 246(a)(1) (1970) (repealed 1972). This provision was popularly interpreted to permit evasion by sufficient insulation of the candidate from his contributors. *See Buckley v. Valeo*, 424 U.S. 1, 62 n.71, 96 S.Ct. 612, 655, n.71 46 L.Ed.2d 659 (1976), *citing* Redish, *Campaign Spending Laws and the First Amendment*, 46 N.Y.U.L.Rev. 900, 905 (1971); Lobel, *Federal Control of Campaign Contributions*, 51 Minn.L.

Rev. 1, 42 (1966). However, judicial interpretation was sparse since enforcement actions were rare and the meaning of "knowledge and consent" was left largely unresolved. *See* Note, *Revision of Federal Law on Campaign Finances*, 30 Geo.Wash.L.Rev. 328, 346–47 (1961). The "political committees" of most presidential candidates were, until 1971, required to report contributions of $100 or more, regardless whether the candidate knew or did not know of the contribution. 2 U.S.C. § 244 (1970) (repealed 1972). A simple failure to comply with either reporting requirement was punishable by a fine of $1000 and imprisonment of one year. 2 U.S.C. § 252(a) (1970) (repealed 1972). Willful violations were punishable by a fine of $10,000 and imprisonment of two years. 2 U.S.C. § 252(b) (1970) (repealed 1972).

All these provisions were repealed by the Federal Election Campaign Act of 1971 (FECA). That Act continued in revised form the campaign contribution reporting provisions, requiring reports by all candidates for federal office and their political committees of annual contributions in excess of $100. 2 U.S.C. § 434 (Supp. II 1972). Knowing receipt was not made an express condition of the candidate's reporting. Failure to report was punishable by a fine of $1000 or one year in prison, 2 U.S.C. § 441 (Supp. II 1972) (repealed 1976); the separately stated penalties for willful violations were eliminated.

The FECA Amendments of 1976 substantially revised the FECA's enforcement mechanism and its penalties. Under the 1976 Amendments simple violations of the reporting requirements are subject to civil enforcement leading to a fine of $5000 or an amount equivalent to the contribution, 2 U.S.C. § 437g(a)(5)(B) (1976), and knowing and willful violations to a fine of $10,000 or twice the amount of the contribution, 2 U.S.C. § 437g(a)(7) (1976). (The civil enforcement provisions were again amended in 1980, but the penalties authorized were not revised. FECA Amendments of 1979, Pub. L.No. 96–187, § 108, 93 Stat. 1360 (1980).) The FECA Amendments of 1976 preserved the possibility of criminal prosecution for knowing and

We do not believe that summary judgment was appropriate at this juncture in the proceeding. Although we acknowledge good policy reasons for nondisclosure under 7(C) of the identities of persons investigated but never subsequently prosecuted for crimes, we are not prepared to state this as the rule for every case and we do not know enough about the documents at issue here to make any more refined ruling than that.[12]

It is true that several courts have approved nondisclosure of the names of the unindicted targets of investigation under the 7(C) exemption,[13] but this case presents some special circumstances which have provoked different results in cases in our own district court. Without suggesting that the presence of these circumstances will always or even usually tip the balance in favor of disclosure under 7(C), we mention two. First, the individuals whose privacy interests are argued here were candidates for federal office, not private citizens. As such they may have been "public figures" with less privacy interest than others in information relating to their candidacies.[14]

Second, the information sought about them concerned campaign contributions, contributions which were then and are now required by law to be reported publicly.[15] According to one district court, "the Feder-

---

willful violations—for which the maximum penalty was raised to $25,000 or treble the amount involved. The possibility of imprisonment for up to one year was retained. 2 U.S.C. § 441j(a) (1976).

Both before the FECA and thereafter, knowing receipt of corporate campaign contributions was stated as a separate offense. 18 U.S.C. § 610 (1970) (repealed 1976); 2 U.S.C. § 441b (1976). Until the FECA Amendments of 1976 such knowing receipt was punishable by a $1000 fine and one year's imprisonment or by a $10,000 fine and two years' imprisonment if the violation were "willful." Knowing receipt of corporate contributions is now subject to the same penalties as other violations of the FECA, described above.

Because failure to report contributions was and is independently penalized and because the reporting requirements have not consistently or clearly turned on the candidate's knowing receipt, it is not entirely correct to assert that "a recipient does not violate the law unless he or she 'knowingly, accepts any [corporate] contribution'." Brief for Appellee at 23. However, the penalties prescribed by law do (and did) vary with the state of mind of the recipient and under prior law certain candidates may not in fact have committed a violation if they were unaware of a reportable contribution. Since this is so, the government's argument that factors indicating the recipient's knowledge and intent should be considered in reviewing the warrant for non-disclosure under 7(C) is not without some foundation. We do not here decide the extent to which such factors should be considered. *See* text preceding note 20, *infra*.

12. The *per se* argument first made by Mr. Ruff and developed by the government is that disclosure would "subject those individuals to public embarrassment and ridicule by linking them to a criminal investigation conducted by WSPF with the attendant adverse inferences to be drawn therefrom when no inferences are warranted."

Judge Pratt in *Congressional News Syndicate v. United States Dep't of Justice*, 438 F.Supp. at 543–44, dismissed a similar argument made as to ledgers of campaign contributions kept by the "Townhouse Operation" as follows:

. . . what might be termed the Government's "aura of Watergate" argument [is] flawed by overstatement; the *per se* rule implicit in [it] is fundamentally incompatible with a balancing standard such as that here.

. . . . .

In concluding as a matter of law and undisputed fact that plaintiff is entitled to the information contained in the ledger sheets, we do not depreciate the degree to which disclosure of the information may embarrass wholly innocent contributors and recipients. Nevertheless, to permit the "aura of Watergate" within which the Townhouse Operation transpired to become the basis for suppressing the details of contributions would be to exacerbate the original failure to disclose them. In the language of the exemption, whatever invasion of privacy may ensue from production of this information is not "unwarranted." The risk of such invasion was assumed by anyone making or receiving contributions reportable under the FCPA.

13. *Librach v. FBI*, 587 F.2d 372 (8th Cir. 1978); *Tax Reform Research Group v. IRS*, 419 F.Supp. 415, 419–20 (D.D.C.1976). *But cf. Tennessean Newspaper, Inc. v. Levi*, 403 F.Supp. 1318 (M.D.Tenn.1975) (7(C) does not authorize withholding from media of routine information concerning persons arrested or indicted).

14. *See Nixon v. Adm'r Gen. Serv.*, 433 U.S. 425, 455–65, 97 S.Ct. 2777, 2796–2801, 53 L.Ed.2d 867 (1977).

15. *See* note 11, *supra*.

al Corrupt Practices Act disclosure requirements [16] strip contributors and recipients equally of whatever cloak of privacy their relationship would have had in the statute's absence." *Congressional News Syndicate v. United States Department of Justice*, 438 F.Supp. 538, 543 (D.D.C.1977). *Accord, Fund for Constitutional Government v. National Archives and Records Service*, 485 F.Supp. 1 (D.D.C.1978), *modified*, (D.D.C. Apr. 25, 1979) (ordering release in accord with *Congressional News* of information about campaign contributions "regarding persons who actually violated the [Federal Corrupt Practices] Act" or which involve "possible culpability" under that Act).

The district court here seemed to distinguish the *Congressional News* decision (never appealed by the government) on the ground that the "Townhouse Operation" ledger sheets listing contributors and recipients there disclosed,[17] were prepared by the investigatory target for its own purposes rather than by the investigators for purposes of the investigation.[18]

The government employs this distinction in the service of its own argument concerning the reliability of the information contained in the materials. Independently prepared materials, it argues, are more akin to the public reports required by law, and therefore more reliable, than narrative accounts of the witnesses who may have been motivated by assurances of lenient treatment. In fact, the district court appeared to place great store in the uncorroborated nature of the accusations and did not repudiate the *Congressional News* rationale requiring disclosure of certain information concerning campaign contributions.

For precisely that reason we believe that appellant was entitled to find out more about the alleged unreliability of the information sought. Common Cause asserts that the information was provided under oath and subject to perjury sanctions and that in some cases the disclosures may have been made on advice of counsel.[19] We note also that the one staff memorandum released showed that the WSPF investigator there involved had demanded and was supplied with corroboration of the information provided by a corporate officer. This procedure may well have been followed in other instances.

Passage of time between the events and their disclosure to the WSPF investigators was also mentioned by the trial judge as a factor indicating unreliability, but this factor too must have varied from witness to witness, since the investigation was commenced in 1973 and covered events from 1968 to 1973. The point is that some of the information may be just as documented or reliable as the ledgers in *Congressional News*; we simply do not know. We think a determination of the unreliability of the requested information requires more information about the nature of the materials withheld: *e. g.*, the directness or indirect-

---

16. The Federal Corrupt Practices Act was the statutory predecessor of the FECA, both of which, as described above, note 11, required disclosure of campaign contributions and prohibited knowing receipt of corporate campaign contributions.

17. It appears that many of the contributors and recipients involved in *Congressional News* were not prosecuted. 483 F.Supp. at 540.

18. The significance of this distinction is unclear. The trial judge may implicitly have determined that such independently prepared material would not qualify as an "investigatory record" that may be withheld under the FOIA or as an "agency record" for which the FOIA requires disclosure. *Congressional News* expressly holds that the documents there sought were "investigatory records" within the FOIA's disclosure requirements. 438 F.2d at 542. We

have no occasion to consider this aspect of that case. For our purposes the helpfulness of the *Congressional News* decision inheres in its rationale for disclosure of materials held to be "investigatory records." We find the rationale stated in that case, as applied to the facts of this case, persuasive enough to preclude the entry of summary judgment at this point in the proceedings.

19. Brief for Appellant at 11–12. The Ruff affidavit stated that the information withheld "originated either in grand jury proceedings or in office interviews of, or letters from, witnesses or their attorneys." App. 19. The one disclosed WSPF staff memorandum reveals that information was directly supplied by an attorney for the corporation concerned.

ness of the informant's knowledge, the recency or remoteness of the event, and the nature and extent of corroboration or lack thereof. Appellant's first argument concerning disputed issues of fact is thus well taken.

Appellant's second argument concerning disputed issues of fact points to the parties' differing assessments of the actual harm which disclosure would inflict. We are uncertain of the precise relevance of this factor to disclosure under 7(C).

The material already disclosed reveals a wide range of recipients, amounts and media of contribution, covering all parts of the political spectrum and involving both incumbents and contenders, successful candidates and also-rans, currently active figures and political retirees. However, the extent to which the "warrant" for disclosure should depend upon such factors is unclear. We think there is at least an analytic line to be drawn between damage to a candidate's reputation and injury (caused by such damage) to that candidate's present or future political career. Obviously, the extent of harm to a political career would vary with the person's current status as well as with the nature and circumstances of the alleged contribution; but one may well assume that any taint would do some harm to an alleged recipient's reputation.

Moreover, circumstances or allegations which suggest high culpability may factor into both sides of the privacy balance in such a way that their presence or absence would make little difference to the outcome; that is, the more culpable the behavior suggested by the circumstances or alle-

gations revealed, the more damaging the disclosure to the candidate's reputation, but for the same reason, the public interest in having the information disclosed might be greater.[20] We do not intend to conclude the issue, however, and leave to the district court as an initial matter the determination whether and to what extent factors bearing upon potential "harm" may be pursued through discovery or should enter into a judgment of the propriety of disclosure under 7(C).

Discovery can be controlled by the trial judge or magistrate to avoid both undue prolongation of the case and premature disclosure of the very material sought to be protected. It could be that a more particularized affidavit or an annotated *Vaughn* index [21] would be sufficient for the trial judge to strike the proper balance. If not, the trial judge may, of course, consider the possibility of *in camera* examination.[22]

Nondisclosure of some or all of the documents might be justified, but we cannot and do not decide that now. We remand to permit presentation to the trial judge of additional facts concerning the nature and reliability of the requested information contained in the materials withheld and concerning other factors deemed relevant by the trial judge to the balancing required by 7(C).[23] *See Weisberg v. United States Department of Justice,* 543 F.2d 308 (D.C. Cir. 1976).

*Vacated and Remanded.*

**20.** The same point might also be made about extremely reliable information, but we leave this determination to the trial judge initially.

**21.** *Vaughn v. Rosen,* 484 F.2d 820 (D.C. Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

**22.** *See EPA v. Mink,* 410 U.S. 73, 92–93, 93 S.Ct. 827, 838, 35 L.Ed.2d 119 (1973); *Hayden v. Nat'l Security Agency,* 608 F.2d 1381, 1386–88 (D.C. Cir. 1979); *Vaughn v. Rosen,* 484 F.2d at 825.

**23.** The trial judge is, of course, free to rule on the merits of the arguments not reached in his opinion below. We recognize that a decision in the government's favor on the merits of exemption 3 (*supra,* note 4) might be thought to obviate a ruling on 7(C). Given the possibility of appeal, however, the trial judge may find, even if he be disposed to rule in the government's favor on exemption 3, that the most expeditious course is to wait and rule on both exemptions simultaneously. We leave this matter to his sound discretion and do not wish to imply anything concerning the merits of exemption 3.