The WASHINGTON POST COMPANY

v.

UNITED STATES DEPARTMENT OF STATE, et al., Appellants.

No. 84–5604.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1985.

Decided Feb. 5, 1988.

Al J. Daniel, Jr., Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellants. Bruce G. Forrest, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellants.

Paul Mogin, with whom David E. Kendall, Kevin T. Baine and Lon S. Babby, Washington, D.C., were on the brief, for appellee.

Before ROBINSON, EDWARDS and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

Dissenting Opinion filed by Circuit Judge BORK.

SPOTTSWOOD W. ROBINSON, III,
Circuit Judge:

This appeal summons us to examine this case a second time. Again at issue is an order of the District Court requiring production by the Department of State[1] of certain documents[2] requested by the Washington Post Company (the Post) pursuant to the Freedom of Information Act (FOIA).[3] In that court the Department contended, as it does here, that revelation of these materials would "constitute a clearly unwarranted invasion of personal privacy," and, accordingly, that they are exempted from mandatory release by FOIA's Exemption 6.[4] The District Court entered summary judgment for the Post on the ground that the strong public interest in disclosure of governmental information outweighed what the court deemed would amount to a relatively insignificant invasion of privacy.[5]

We hold that in the circumstances portrayed by the record, the information solicited by the Post is potentially accessible under FOIA. We find, however, that the District Court undertook to resolve a serious factual dispute concerning the extent of harm consequent upon an unveiling of that information. We therefore reverse the production order and remand the case to that court for further proceedings in harmony with this opinion.

## I. THE BACKGROUND

In September, 1979, the Post asked the State Department to release, pursuant to FOIA, any documents indicating whether Dr. Ali Behzadnia and Dr. Ibrahim Yazdi were United States citizens or held valid United States passports.[6] At the time, both of these individuals lived in Iran and were prominent figures in the governmental hierarchy of that country. The Department denied the Post's request, invoking FOIA Exemption 6, which authorizes withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[7] The Department asserted that disclosure of any record revealing that Dr. Behzadnia or Dr. Yazdi is a naturalized United States citizen would result in embarrassment and physical harm, and possibly even death.[8] This disposition was affirmed by the Department's Council on Classification Policy, which felt that "the privacy interests to be protected are not incidental ones, but, rather are such that they clearly outweigh any public interests which might be served by release of the requested information."[9]

The Post then instituted the present suit in the District Court to enjoin the State Department from withholding the data requested.[10] That court held that the records in question are not "similar files" protected by Exemption 6, and accordingly granted summary judgment for the Post.[11] On appeal, this court agreed that the records are not "similar files," and therefore did not consider the possible impact of disclosure

---

1. Appellants are the Department of State, the Secretary of State, and the Department's Information and Privacy Coordinator. References herein to the Department are to all appellants collectively unless otherwise indicated.

2. While the Department has neither confirmed nor denied the existence of the data sought, the litigation has progressed on the assumption that they do. For purposes of this appeal, we proceed on the same theory.

3. 5 U.S.C. § 552 (1982).

4. See *id.* § 552(b)(6), quoted in text *infra* at note 7.

5. *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C. July 3, 1984) (memorandum) at 9, Joint Appendix (J.App.) 183.

6. Letter from Christopher M. Little to Director of Freedom of Public Affairs, Department of State (Sept. 11, 1979), J.App. 8.

7. 5 U.S.C. § 552(b)(6) (1982).

8. Letter from Robert E. Lamb to Christopher M. Little (Oct. 11, 1979), J.App. 14.

9. Letter from William D. Blair, Jr., to John B. Kuhns and Lon S. Babby (Dec. 12, 1979), J.App. 24.

10. Complaint, *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.) (filed Oct. 9, 1979), J.App. 4–7.

11. *Washington Post Co. v. Department of State,* No. 79–2688 (D.D.C. Mar. 11, 1980) (order), J.App. 68–69.

upon any privacy interest involved.[12] The Supreme Court, however, finding this reading of "similar files" too narrow, reversed.[13] The Court held that Congress intended that the phrase be given a broad meaning, and thus to include any file containing "[g]overnment records on an individual which can be identified as applying to that individual."[14] This court in turn remanded to the District Court for determination of whether public release of such records would amount to an intrusion upon personal privacy above the statutorily tolerated level.[15]

Subsequently, the State Department learned that Dr. Behzadnia was no longer living in Iran. The Department then sought to comply with the Post's request as to him, but was unable to locate any material relating to issuance of a United States passport to him or any other document associated with his name.[16] From that point the case proceeded with respect to Dr. Yazdi alone.

Both sides moved for summary judgment in the District Court, thus confronting it with the task of balancing the public interest in disclosure against the privacy interest of Dr. Yazdi. The State Department relied on affidavits averring that public dissemination of the information desired by the Post could be embarrassing to Dr. Yazdi and could even expose him to physical harm.[17] The Post, on the other hand, pointed to several press accounts of events in Iran, and to books published since the Iranian Revolution that had referred to Dr. Yazdi's reputed ties to the United States. For example, both *Inside the Iranian Revolution,* by a former director of the State Department operations center, and *Mission to Iran,* by a former ambassador to Iran, state that Yazdi is a United States citizen.[18] Because information of that character was already in the public domain and the dire consequences predicted by the State Department had not occurred, the District Court concluded that the effect on personal privacy from release of the requested documents would be insubstantial.[19]

12. *Washington Post Co. v. Department of State,* 207 U.S.App.D.C. 372, 374, 647 F.2d 197, 199 (1981).

13. *Department of State v. Washington Post Co.,* 456 U.S. 595, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982).

14. H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966), *quoted in Department of State v. Washington Post Co., supra* note 13, 456 U.S. at 602, 102 S.Ct. at 1961, 72 L.Ed.2d at 364.

15. *Washington Post Co. v. Department of State,* No. 80–1509 (D.C.Cir. Apr. 22, 1983) (order), J.App. 97.

16. Affidavit of Stewart Bibbs, Jr., Exhibit B to Defendants' Response to Plaintiff's Statement of Material Facts, *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.) (filed Feb. 2, 1984), J.App. 133.

17. Affidavit of Harold H. Saunders, Exhibit A to Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment, *Washington Post Co. v. Department of State,* No. 79–2688 (D.D.C.) (filed Jan. 17, 1980), J.App. 18–20 [hereinafter Saunders Affidavit]; Supplemental Affidavit of Harold H. Saunders, Exhibit A to Defendants' Motion for Reconsideration of the Court's Order of March 11, 1980, *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.) (filed May 1, 1980), J.App. 79–81 [hereinafter Supplemental Saunders Affi-

davit]; Affidavit of David T. Schneider, Exhibit A to Defendants' Response to Plaintiff's Statement of Material Facts, *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.) (filed Feb. 2, 1984), J.App. 126–132 [hereinafter Schneider Affidavit].

18. J. Stempel, *Inside the Iranian Revolution* 166 (1981), Exhibit 6 to Affidavit of R. Scott Armstrong, Exhibit A to Plaintiff's Statement of Genuine Issues of Material Fact, *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.) (filed Mar. 30, 1984), J.App. 167, 169 [hereinafter Armstrong Affidavit] (stating that "Yazdi never renounced his naturalization in 1962 and even today is an American citizen"); W. Sullivan, *Mission to Iran* 200 (1981), Exhibit 7 to Armstrong Affidavit, *supra,* J.App. 170, 171a (describing Dr. Yazdi as "an Iranian immigrant to the United States who had lived many years in Houston, Texas, and acquired United States nationality").

19. *Washington Post Co. v. Department of State, supra* note 5, at 6, J.App. 180. In deciding that the trespass on privacy would be slight because so much speculation had already abounded in the press, the District Court did not address specifically the Department's contention that *official* confirmation of Dr. Yazdi's citizenship "would have results which constitute a serious threat to [his] personal privacy, safety, and well being, including arrest and imprisonment." Schneider Affidavit, *supra* note 17, ¶ 7, J.App. 131. See text *infra* at notes 75–77.

Against this personal privacy interest the District Court balanced what it found to be a strong public interest in favor of disclosure. The court identified two elements of this public interest. First, the court observed that whether prominent officials of the Iranian government are American citizens is a legitimate matter of public concern, especially because such information "would shed light on the backgrounds and motivations of these individuals and on the composition of the body of officials exercising political power in Iran."[20] Second, the court declared that this information would reveal what steps, if any, the United States Government had taken to revoke the order naturalizing Dr. Yazdi and to cancel his certificate of naturalization.[21] The records pursued by the Post might show, the court reasoned, whether governmental officials had been derelict in their duties by failing to institute proceedings toward that end.[22] Weighing this public interest against Dr. Yazdi's privacy interest, the court found that disclosure of the sought-after information would not constitute a clearly unwarranted invasion of privacy.[23]

**20.** *Washington Post Co. v. Department of State,* supra note 5, at 8, J.App. 182.

**21.** *Id.* See 8 U.S.C. § 1451(a) (1982). This provision imposes a duty on United States Attorneys to institute proceedings to revoke a person's citizenship upon an affidavit showing good cause to believe that citizenship was illegally procured, or procured by concealment of a material fact or willful misrepresentation. Establishment of permanent residence in a foreign country within five years of becoming naturalized is prima facie evidence of a lack of intention, at the time of naturalization, to reside permanently in the United States, hence a ground for revocation. *Id.* § 1451(d).

**22.** *Washington Post Co. v. Department of State,* supra note 5, at 8, J.App. 182.

**23.** *Id.* at 9, J.App. 183.

**24.** *Afshar v. Department of State,* 226 U.S.App. D.C. 388, 406, 702 F.2d 1125, 1143 (1983); *McGehee v. CIA,* 225 U.S.App.D.C. 205, 211–212, 697 F.2d 1095, 1101–1102, *aff'd in pertinent part on reh'g,* 229 U.S.App.D.C. 148, 711 F.2d 1076 (1983); *Londrigan v. FBI,* 216 U.S.App.D.C. 345, 355–356, 670 F.2d 1164, 1174–1175 (1981); *Common Cause v. National Archives & Records Serv.,* 202 U.S.App.D.C. 179, 181, 628 F.2d 179, 181 (1980); *Founding Church of Scientology v. National Sec. Agency,* 197 U.S.App.D.C. 305, 317,

## II. THE SUMMARY JUDGMENT

■ Time and again, this court has emphasized that FOIA cases are not immune to summary-judgment requirements.[24] Only upon a suitable showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" is summary judgment in order.[25] By the same token, an agency may not defeat its opponent's right to an evidentiary hearing on such an issue merely by filing an affidavit purporting to support a motion for such a judgment.[26] Rather, "the requester may ... produce countervailing evidence,"[27] and if any genuine issue of material fact remains, summary judgment is improper.[28]

In light of these uncontroversial precepts, the District Court erred in awarding summary judgment to the Post. The record makes abundantly clear a factual dispute going to the very heart of the case: the extent of potential harm to Dr. Yazdi should the Department release information on his citizenship.[29] That issue could prop-

610 F.2d 824, 836 (1979); *National Ass'n of Gov't Employees v. Campbell,* 192 U.S.App.D.C. 369, 373, 593 F.2d 1023, 1027 (1978); *Sears, Roebuck & Co. v. GSA,* 180 U.S.App.D.C. 202, 206, 553 F.2d 1378, 1382, *cert. denied,* 434 U.S. 826, 98 S.Ct. 74, 54 L.Ed.2d 84 (1977); *National Cable Television Ass'n v. FCC,* 156 U.S.App.D.C. 91, 94, 479 F.2d 183, 186 (1973).

**25.** Fed.R.Civ.P. 56(c).

**26.** *Miller v. Casey,* 235 U.S.App.D.C. 11, 14, 730 F.2d 773, 776 (1984); *Military Audit Project v. Casey,* 211 U.S.App.D.C. 135, 149, 656 F.2d 724, 738 (1981); *Halperin v. CIA,* 203 U.S.App.D.C. 110, 114, 629 F.2d 144, 148 (1980).

**27.** *Founding Church of Scientology v. National Sec. Agency,* supra note 24, 197 U.S.App.D.C. at 317, 610 F.2d at 836.

**28.** *Afshar v. Department of State,* supra note 24, 226 U.S.App.D.C. at 406, 702 F.2d at 1143; *Halperin v. CIA,* supra note 26, 203 U.S.App.D.C. at 118, 629 F.2d at 152; *Board of Trade v. Commodities Futures Trading Comm'n,* 200 U.S. App.D.C. 339, 351–352, 627 F.2d 392, 404–405 (1980).

**29.** Compare, e.g., Saunders Affidavit, *supra* note 17, at 2–3, J.App. 19–20 and Supplemental Saun-

erly be resolved only by trial, not by fact-finding on the basis of materials tendered in support of and in opposition to summary judgment.[30]

When we review refused FOIA requests, we are often called upon to assess the probable consequences of releasing particular information. And when the litigants quarrel over key factual premises for a determination on that score, we have unhesitatingly ruled that summary judgment is inappropriate. For instance, as our Exemption 4[31] cases well illustrate, we have frequently found that disputes over the likelihood or extent of harm from disclosure preclude summary judgment:

> Where there is a conflict in the affidavits as to what adverse consequences will flow from the revelation of the facts contained in the documents sought to be disclosed, then it appears that there is indeed a conflict regarding very material facts which calls for some type of adversary procedure. The District Court thus attempted to resolve the conflict in the ultimate facts without having the evi-

dence before it.... Summary judgment was not appropriate.[32]

Similarly, in applying the privacy-balancing test of Exemption 7(C),[33] we have held that "differing assessments of the actual harm which disclosure would inflict" generate an issue of fact unsuitable for resolution on summary judgment.[34] The same conclusion follows inexorably here.

Facing controverted issues of fact, the District Court proceeded to resolve a pivotal conflict in the affidavits respectively tendered by the Post and the State Department on the cross-motions for summary judgment.[35] Courts are forbidden, however, to conduct trial by affidavit and thus deprive litigants of their right to an evidentiary hearing on issues of fact.[36] As we have said in the past, "[w]e think there is a right of confrontation ... and so the parties should have the right to examine the affiants either by depositions or in open court.... [T]he case should be tried like any other adversary proceeding."[37]

This limitation on the use of summary judgment is not a mere technicality. The

---

ders Affidavit, *supra* note 17, at 2–3, J.App. 80–81 with Armstrong Affidavit, *supra* note 18, at 1–6, J.App. 153–158.

**30.** See note 35 *infra* and accompanying text.

**31.** 5 U.S.C. § 552(b)(4) (1982).

**32.** *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S.App.D.C. at 206, 553 F.2d at 1382. And in *National Ass'n of Gov't Employees v. Campbell, supra* note 24, we warned that a trial judge could not engage in unsubstantiated refutation of expert testimony on the effects of disclosure in order to clear the way for summary judgment:

> The court's surmise, however, plausible on its face, cannot substitute for full-bodied proof. Unless a fact suitably advanced is plainly undemonstrable, the litigant is entitled to a fair opportunity to establish it by evidence, and to a hearing of his evidence before the fact is judicially assessed. The factual issues on competitive loss thus posed ... accordingly warrant full evidentiary trial.

192 U.S.App.D.C. at 374, 593 F.2d at 1028; see also *Worthington Compressors v. Costle*, 213 U.S. App.D.C. 200, 208, 662 F.2d 45, 53 (1981) ("[i]n rejecting [appellants'] evidence in favor of EPA's contention that the information is not confidential, without giving any indication why it considered the issue undisputed or appellants' evidence incredible, the district court committed error"). Summary judgment remains improper

whether the controversy pertains to the facts on which a prediction rests, see *id.* at 208, 662 F.2d at 53; *National Ass'n of Gov't Employees v. Campbell, supra* note 24, 192 U.S.App.D.C. at 374–375, 593 F.2d at 1028–1029, or concerns the ultimate prediction resting on uncontroverted facts, see *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S.App.D.C. at 206, 553 F.2d at 1382.

**33.** 5 U.S.C. § 552(b)(7)(C) (Supp. IV 1986).

**34.** *Common Cause v. National Archives & Records Serv., supra* note 24, 202 U.S.App.D.C. at 186, 628 F.2d at 186.

**35.** *Washington Post Co. v. Department of State, supra* note 5, at 6, J.App. 180 ("[u]nder the facts of this case the Court finds that the invasion of privacy would only be moderate, if not slight").

**36.** See *United States v. General Motors Corp.*, 171 U.S.App.D.C. 27, 48, 518 F.2d 420, 441 (1975) (citing *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728–729, 88 L.Ed. 967, 972 (1944)).

**37.** *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S.App.D.C. at 207, 553 F.2d at 1383; see also *National Ass'n of Gov't Employees v. Campbell, supra* note 24, 192 U.S.App.D.C. at 376, 593 F.2d at 1030.

integrity of a court's de novo judgment rests upon an adversarial system of testing for truth when critical adjudicative facts are subjects of a contest.[38] Obviously, the more difficult the issues and equal the weight of expert opinion in a case, the greater the role that process plays in honing the court's judgment. It is no wonder, then, that we have recognized "the advantages of adversary procedures in testing the strength of the government's position in FOIA cases," [39] and have declared that "[t]he importance of maximizing adversary procedures in suits such as this cannot be gain-said." [40] On remand, the District Court must heed these teachings, and resort to some salutary alternative to summary judgment.

## III. THE DEGREE OF DEFERENCE DUE THE STATE DEPARTMENT

■ Our dissenting colleague, however, would direct an award of summary judgment, not to the Post, but instead to the State Department. The rationale for that course is that an evidentiary hearing of this question would be "wholly unsuited to the capacities of the judicial process." [41] Put another way, the dissent contends that we must defer to the State Department's assessment of the seriousness of the threat of harm to Dr. Yazdi because the courts lack the ability to deal with it. This thesis, advanced relentlessly and with singular energy, disregards firm precedent, ignores the lengthening record of satisfactory judicial performance in adjudication of questions of predictive fact under FOIA, and counsels an abdication of judicial responsibility to unbridled Executive Branch discretion in defiance of an explicit congressional directive that courts review agency withholding claims de novo.

### A. *The Obligation to Review De Novo*

When FOIA was originally enacted in 1967, Congress foresaw the need for de novo judicial review [42] "in order that the

38. See, e.g., *Londrigan v. FBI, supra* note 24, 216 U.S.App.D.C. at 356 n. 63, 670 F.2d at 1175 n. 63 ("discovery benefits not only the requester but also the court, which must review an agency decision not to release"), and cases discussed in note 24 *supra.*

39. *Military Audit Project v. Casey, supra* note 26, 211 U.S.App.D.C. at 158, 656 F.2d at 751; see also *National Ass'n of Gov't Employees v. Campbell, supra* note 24, 192 U.S.App.D.C. at 376, 593 F.2d at 1030.

40. *Founding Church of Scientology v. National Sec. Agency, supra* note 24, 197 U.S.App.D.C. at 313–314, 610 F.2d at 832–833; accord *Ray v. Turner,* 190 U.S.App.D.C. 290, 315, 587 F.2d 1187, 1212 (1978) (concurring opinion); *Vaughn v. Rosen,* 157 U.S.App.D.C. 340, 348, 484 F.2d 820, 828 (1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

41. Dissenting Opinion (Dis.Op.) at 1.

42. The right to de novo review extended by FOIA, see 5 U.S.C. § 552(a)(4)(B) (1982), exerts a profound effect upon the amount of respect the court must yield to agency determinations. While a court may have to accord considerable deference to agency expertise on review of a predictive judgment under a narrow standard— for example, Administrative Procedure Act (APA) review of rulemaking, e.g., *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 813–814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697, 725–726 (1978); *FPC v. Transcontinental*

*Gas Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377, 395 (1961); *Industrial Union Dep't, AFL–CIO v. Hodgson,* 162 U.S.App.D.C. 331, 338–339, 499 F.2d 467, 474–475 (1974), or of reverse-FOIA decisions, see *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *National Org. for Women v. Social Sec. Admin.,* 237 U.S.App.D.C. 118, 736 F.2d 727 (1984)—it need not do so when, as here, it is charged with deciding de novo whether disclosure is required by FOIA. See *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S.App.D.C. at 205, 553 F.2d at 1381 (distinguishing de novo review under FOIA from review of agency action under APA); 120 Cong.Rec. 36,627 (1974), *reprinted in* Subcomm. on Admin. Practice & Procedure, Senate Comm. on the Judiciary & Subcomm. on Gov't Information & Individual Rights, House Comm. on Gov't Operations, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 (Pub.L. No. 93–502) Source Book: Legislative History, Texts, and Other Documents, 1st Sess. 415 (1975) [hereinafter 1974 Source Book] (statement of Rep. Erlenborn) (distinguishing de novo review of FOIA exemption claims from review of "[t]he decisions of regulatory agencies [which] are reached ordinarily as a result of adversary proceedings, public proceedings, and the making of a record"); see also *Reporters Comm. for Freedom of the Press v. United States Dep't of Justice,* 259 U.S.App.D.C. 426, 430, 816 F.2d 730, 734, *aff'd on rehearing,* 265 U.S.App.D.C. 365, 831 F.2d 1124 (1987) (departing from traditional practice, Congress placed primary responsibility

ultimate decision as to the propriety of the agency's action is made by the court and [to] prevent [the proceeding] from becoming meaningless judicial sanctioning of agency discretion." [43] In all cases, it was the reviewing court, not the agency subjected to review, that was ultimately to determine the propriety of the agency's action in withholding the requested information.[44] In 1974, Congress reaffirmed and strengthened this position in the face of a strenuous effort to legislate a narrower standard for review of Exemption 1 claims premised on exigencies of the national security.[45] As we have characterized the result,

> [t]he [1974] legislative history underscores that the intent of Congress regarding de novo review stood in contrast to, and was a rejection of, the alternative suggestion ... that in the national security context the court should be limited to determining whether there was a reasonable basis for the decision by the appropriate official to withhold the document.[46]

In light of this development, how can it be maintained that Exemption 6 privacy claims call for anything less than full de novo review? These claims are very different from Exemption 1 national security claims, and accordingly the arguments for judicial deference in the Exemption 1 context have no force when a court weighs a personal privacy interest. More startlingly, the approach advocated by the dissent would involve deference to a degree even beyond that envisioned by congressional proponents of a narrow scope of judicial review in the national security context. Although Congress expressly provided for de novo review of Exemption 6 claims and did not prescribe any special deference to agency judgments underlying them, the dissent urges us to defer to the State Department, on the grounds that judges know too little about conditions in Iran to second-guess the agency [47] and that "any reader of the Washington Post"—including, presumably, judges—can see that the State Department prediction "is very plausible." [48]

Such an exercise in institutional self-denegration would flatly ignore the oversight function that Congress imposed on the courts. In addition to the express statutory command to review agency withholdings de novo, the legislative record is replete with indicia of congressional confidence in the capacity of the judiciary to evaluate FOIA questions bearing on national security and foreign policy. Before examining the reviewing stance appropriate to disposition of the instant appeal, we revisit the record to demonstrate the unequivocal conviction of Congress that courts can and should review FOIA requests implicating factors of the sort operative here.

### B. *De Novo Review in the Exemption 1 Context*

When Congress amended FOIA in 1974, it did so in significant part to reverse the Supreme Court's decision in *EPA v.*

---

for interpreting FOIA, not on the agencies, but on "the judiciary, whose institutional interests are not in conflict with ... statutory purpose [of disclosure]").

**43.** S.Rep. No. 813, 89th Cong. 1st Sess. 8 (1965), *reprinted in* Subcommittee on Admin. Practice and Procedure, Senate Comm. on the Judiciary, 93d Cong., 2d Sess., Freedom of Information Act Source Book: Legislative Materials, Cases, Articles 43 (1974).

**44.** 5 U.S.C. § 552(a)(4)(B) (1982).

**45.** Exemption 1 protects from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order...." 5 U.S.C. § 552(b)(1) (1982). The language of the Conference Report contemplates review of FOIA requests involving disclosure of a particular classified record. There is no national security claim or classified document in the case before us, and no support can be found for application of some divergent standard of review simply because some operative event occurred outside the territorial limits of the United States.

**46.** *Ray v. Turner, supra* note 40, 190 U.S.App. D.C. at 296, 587 F.2d at 1193.

**47.** Dis.Op. at 41–42.

**48.** *Id.* at 44.

*Mink*,[49] which had foreclosed in camera inspection of classified documents.[50] Representative Mink, the plaintiff in that case, explained the purpose of Congress:

> Our intention in making this change is to place a judicial check on arbitrary actions by the Executive to withhold information that might be embarrassing, politically sensitive, or otherwise concealed for improper reasons rather than truly vital to national defense or foreign policy. We are not saying that any material must be released, only that it must be submitted to an impartial judge to determine whether its withholding meets the provisions and purposes of the act.[51]

Adoption of the in camera inspection provision of the Act sparked extensive debate on the standard appropriate for judicial review of Exemption 1 claims. The bill, as reported out by the Senate Judiciary Committee, stipulated that an exemption claim involving classified material was to be sustained unless it was determined that the decision to classify lacked a reasonable basis under criteria set forth by the govern-

ing executive order.[52] Senator Muskie, however, introduced an amendment to remove this language, warning that the statutory "presumption"[53] contained in the committee bill would "make the independent judicial evaluation meaningless ... go[ing] far to reduce the judicial role to that of a mere concurrence in Executive decisionmaking."[54] Review of classification decisions, the Senator urged, ought to turn on the merits of the exemption claim rather than the force of a statutory presumption.[55] And, emphasizing the importance of review de novo,[56] the Senator had no doubt as to the ability of judges to make the necessary determinations:

> By telling judges so specifically how to manage their inquiry into the propriety of a classification marking, we show a strange contempt for their ability to devise procedures on their own to help them reach a just decision. Moreover, by giving classified material a status unlike that of any other claimed Government secret, we foster the outworn myth that only those in possession of military and

---

49. 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

50. S.Rep. No. 1200, 93d Cong., 2d Sess. 9, 12 (1974), U.S.Code Cong. & Admin.News 1974, p. 6267, *reprinted in* 1974 Source Book, *supra* note 42, at 226, 229.

51. 120 Cong.Rec. 6,813 (1974), *reprinted in* 1974 Source Book, *supra* note 42, at 260; see *id.* at 6,814, *reprinted in* 1974 Source Book, *supra* note 42, at 263 (statement of Rep. Gude) (recounting difficulties in obtaining information from Department of Defense) ("under the present law, I could not seek court review of the Department's position. If H.R. 12471 were to be enacted, however, I could seek that court review. I could get a hearing by an independent arbiter on whether the executive branch had acted rightly in withholding information"); see also *id.* at 36,877, *reprinted in* 1974 Source Book, *supra* note 42, at 467 (statement of Sen. Cranston) (classifiers "will do a better job, and a more honest and thoughtful job, of classifying documents in the future if they know their decision may be reviewed by an independent judiciary").

52. *Id.* at 17,023, *reprinted in* 1974 Source Book, *supra* note 42, at 303.

53. See *id.* at 17,022, 17,024, *reprinted in* 1974 Source Book, *supra* note 42, at 303, 308. This term referred ostensibly to the narrow scope of

judicial review proposed by the Committee, which would necessarily and artificially elevate an agency decision to exempt to a more imposing level, much like a rebuttable presumption of correctness would do.

54. *Id.* at 17,023, *reprinted in* 1974 Source Book, *supra* note 42, at 304.

55. "I do not see why the head of a department should be able to walk into a judge's chamber, knowing that his testimony is against that of any other expert and weighs more than any other on a one-for-one basis.... Why should he be given a statutory presumption in addition if he cannot make his case on its merits.... We ought not to classify information by presumption, but only on the basis of merit." *Id.* at 17,024, *reprinted in* 1974 Source Book, *supra* note 42, at 308.

56. "Congress authorized de novo probes by the judiciary as a check on arbitrary withholding actions by the Executive.... It should not have required the deceptions practiced on the American public under the banner of national secrecy in the course of the Vietnam war or since to prove to us that Government classifiers must be subject to some impartial review. If courts cannot have full latitude to conduct that review no one can." *Id.* at 17,023, *reprinted in* 1974 Source Book, *supra* note 42, at 304–305.

diplomatic confidences can have the expertise to decide with whom and when to share their knowledge. ... I object to the idea that anything but full de novo review will give us the assurance that classification ... has been brought under check.... I cannot understand why we should trust a Federal judge to be able to sort out valid from invalid claims of Executive privilege in the Watergate affair but not trust him or his colleagues to make the same unfettered judgments in matters allegedly connected to the conduct of defense or foreign policy.[57]

Opponents of the Muskie amendment raised the spectre of judicial shortcomings that the dissent resurrects today,[58] but the arguments of the proponents prevailed. The Senate passed the amendment by a vote of 56 to 29.[59] Thereafter, the Conference Committee adopted the in camera inspection provision of the Senate bill as amended, adding no more than a directive that "courts, in making *de novo* determinations in [Exemption 1] cases, ... will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." [60] The House then accepted, by the overwhelming margin of 349 to 2, the Conference bill authorizing in camera inspection on review of Exemption 1 claims.[61]

President Ford, however, contending that "the courts should not be forced to make ... [decisions] in sensitive and complex areas where they have no particular expertise," [62] vetoed the legislation and the debate resumed. Members of both Houses again voiced their confidence in the competence of the courts to review Exemption 1 claims de novo,[63] and voted resoundingly to

57. *Id.* at 17,023, *reprinted in* 1974 Source Book, *supra* note 42, at 305.

58. See, e.g., Letter from Attorney General William B. Saxbe to Honorable Roman L. Hruska (May 29, 1974), reproduced at 120 Cong.Rec. 17,027 (1974), *reprinted in* 1974 Source Book, *supra* note 42, at 316; see generally 120 Cong. Rec. 17,022–17,031, *reprinted in* 1974 Source Book, *supra* note 42, at 302–327 (debate on Muskie amendment expanding judicial review over classified material withheld subject to Exemption 1).

59. 120 Cong.Rec. 17,031–17,032 (1974), *reprinted in* 1974 Source Book, *supra* note 42, at 328.

60. S.Rep. No. 1200, *supra* note 50, at 12, U.S. Code Cong. & Admin.News 1974, p. 6290, *reprinted in* 1974 Source Book, *supra* note 42, at 229. The Third Circuit has cautioned, however, that the special deference thus called for in Exemption 1 cases is an exception to the scheme of judicial review mandated by FOIA, and is otherwise inconsistent with the courts' obligations under FOIA to conduct de novo review of exemption claims asserted by a withholding agency:

> [FOIA] contains a clear requirement that the reviewing court make a *de novo* determination, and the withholding agency has the burden of establishing that a statutory exemption is applicable. 5 U.S.C. § 552(a)(4)(B). In light of this mandate, courts generally should not pay special deference to the agency's findings. When the drafters of FOIA intended courts to give such deference, they said so explicitly in the legislative history, as they did with respect to cases involving classified national security documents to which Exemption 1 applies.

*Ferri v. Bell*, 645 F.2d 1213, 1221 (3d Cir.1981) (citations omitted). And, as this court has noted in a related context, deference suitable in evaluation of disclosure requests implicating the national security may well be out of place in other cases: "[E]ven as the world of cloak and dagger is not the world of pharmacology, the standards applicable to the [national security] exemptions at issue in *Halperin* [*v. CIA, supra* note 26, 203 U.S.App.D.C. at 110, 629 F.2d at 144], are not the same as those governing Exemption 6." *Arieff v. Department of Navy*, 229 U.S.App.D.C. 430, 435, 712 F.2d 1462, 1467 (1983).

61. 120 Cong.Rec. 34,168 (1974), *reprinted in* 1974 Source Book, *supra* note 42, at 394–396.

62. See Message from President of the United States Vetoing H.R. 12471, an Act to Amend Section 552 of Title 5, United States Code, Known as the Freedom of Information Act, H.R.Doc. No. 383, 93d Cong., 2d Sess., *reprinted in* 1974 Source Book, *supra* note 42, at 484.

63. Senator Kennedy, a member of the Senate Judiciary Committee, declared that

> today judges are examining extremely sensitive information and carrying out that judicial review responsibility very well. We can think of recent cases—the Pentagon Papers case, the Ellsberg case, the Watergate case, the Keith case where the key issue involved national security wiretaps, the Knopf case involving CIA material in a book written by a former CIA official—where courts have met these responsibilities, and have been extremely sensitive to the whole question of national defense and national security.

override the veto.[64] As we have observed *en banc*, "this vote of confidence in the competence of the judiciary affirms our own belief that judges do, in fact, have the capabilities needed to consider and weigh data pertaining to the foreign affairs and national defense of this nation." [65]

## C. *De Novo Review in the Instant Case*

In balancing the disclosure and the privacy interests staked out in this case, the District Court will have to engage in a searching de novo examination of the evidence to be introduced before it in order to gauge the likely consequences of revealing the citizenship information requested by the Post. We have already demonstrated that unquestioning deference to the State Department's affidavits would be unseemly in an Exemption 1 context, and the more so where, as here, no claim of national security or foreign policy concern has been advanced.[66]

---

120 Cong.Rec. 36,874 (1974), *reprinted in* 1974 Source Book, *supra* note 42, at 459. Senator Muskie agreed. *Id.* at 17,023, *reprinted in* 1974 Source Book, *supra* note 42, at 449.

As to "object[ions] to giving so much discretion to a single judge," Senator Cranston argued that "[t]here is little reasonable ground for fear.... [I]n actual practice, many of the top minds of our country—at the various appellate levels of our courts—would in fact be passing on the decision to disclose. If we can not trust their wisdom and good judgment, whose can we trust?" *Id.* at 36,877, *reprinted in* 1974 Source Book, *supra* note 42, at 467. Floor debate in the House echoed these sentiments. See, e.g., *id.* at 36,623, *reprinted in* 1974 Source Book, *supra* note 42, at 406 (statement of Rep. Moorhead) ("I find it totally unrealistic to assume—as apparently the President's legal advisers have assumed—that the Federal judiciary system is somehow not to be trusted to act in the public interest to safeguard truly legitimate national defense or foreign policy secrets of our Government").

**64.** See *id.* at 36,633, 36,882, *reprinted in* 1974 Source Book, *supra* note 42, at 431–433, 480 (respectively, House override by 371–31 and Senate override by 65–27).

**65.** *Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 49–50, 516 F.2d 594, 642–643 (1975) (*en banc*), *cert, denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) (extending logic of *United States v. United States Dist. Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), to foreign contexts; see also *United States v. United States Dist. Court, supra*, 407 U.S. at 320, 92 S.Ct. at 2138, 32 L.Ed.2d at 768 ("[w]e cannot accept the Government's argument that internal security matters are too subtle and complex for judicial evaluation. Courts regularly deal with the most difficult issues of our society. There is no reason to believe that federal judges will be insensitive to or uncomprehending of the issues involved ...").

**66.** This court has already declined an invitation to deviate from orthodox application of Exemption 6 principles when considerations of overseas terrorism enter the case. See *Simpson v. Vance*, 208 U.S.App.D.C. 270, 648 F.2d 10 (1980). Contrary to the dissent's contention that "[i]t should be enough to support the summary judgment here that neither we nor the trial court can possibly say with any assuredness, with or without a hearing, that releasing the information sought would pose no danger to Dr. Yazdi," Dis.Op. at 41, we cannot abdicate our reviewing obligations simply because we must exercise some judgment about circumstances in Iran. Though the dissent anticipates serious detriment from an independent review of the State Department's prediction in this case, a cooler assessment of the risks suggests that reversal of FOIA's presumption favoring disclosure, and dilution of the de novo review standard under Exemption 6 of the Act, promise far greater and more immediate damage. Cf. *Korematsu v. United States*, 323 U.S. 214, 246, 65 S.Ct. 193, 207, 89 L.Ed. 194, 214 (1944) (dissenting opinion) ("[t]he principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need").

In situations where the political-question doctrine presents no problem of justiciability, courts have proceeded to adjudicate cases requiring factual determinations concerning foreign actors and events without doubting their competence to do so. See, e.g., *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (declining to extend act-of-state doctrine to activities of foreign sovereigns in the course of their purely commercial operations; *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (allowing counterclaim for recovery of damages resulting from expropriation of bank's property in Cuba). This court, sitting *en banc* in *Ramirez de Arellano v. Weinberger*, 240 U.S.App.D.C. 363, 745 F.2d 1500 (1984), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985), *on remand*, 252 U.S.App.D.C. 137, 788 F.2d 762 (1985) (*en banc*), held justiciable a complaint alleging that the United States appropriated a cattle ranch in Honduras, without compensating its American owner, for the purpose of constructing a military training camp. 240 U.S. App.D.C. at 375–376, 745 F.2d at 1512–1513. We declared that "[t]he complaint does not reveal that expertise beyond the capacity of the Judi-

**36**

Nor, in our view, is a holding in favor of the Department required by what the dissent characterizes as "common sense." [67]

> ciary is essential to a resolution of the claims," *id.* at 376, 745 F.2d at 1513; as we saw it, the dispute presented "a paradigmatic issue for resolution by the Judiciary," *id.* at 375, 745 F.2d at 1512, notwithstanding its foreign military context. Although we ultimately directed dismissal of the action without prejudice, that was because at that time we deemed the controversy too attenuated to justify an award of the equitable relief sought. 252 U.S.App.D.C. at 139, 788 F.2d at 764.
>
> In a case posing perhaps a greater challenge to the fact-finding capacity of the judiciary, the Second Circuit has held that because torture deliberately perpetrated under color of official authority violates the international law of human rights, the Alien Tort Statute, 28 U.S.C. § 1350 (1982), confers federal jurisdiction over a suit by aliens against an alleged torturer who is served with process within the borders of the United States. *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980) (suit by Paraguayan applicants for political asylum against Paraguayan citizen in United States on visitor's visa, who allegedly caused wrongful death of plaintiffs' son in Paraguay by torture). Similarly, a panel in this circuit dismissed a complaint under the Alien Tort Statute against Libya, the Palestinian Liberation Organization, and others by survivors and personal representatives of deceased victims of a bus attack in Israel, *Tel–Oren v. Libyan Arab Republic,* 233 U.S.App.D.C. 384, 726 F.2d 774 (1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), but only one of the three opinions in that case identified as ground for the dismissal judicial competence to hear the claim, and the focus was primarily on difficulties in determining matters of law, not fact. 233 U.S.App.D.C. at 433–434, 726 F.2d at 823–824 (separate opinion).
>
> Turning to a litigation context in which separation-of-powers concerns pose no problem of justiciability, we find fresh evidence of confidence in the ability of federal courts to engage in factfinding respecting events transpiring in foreign lands. It is accepted that the exclusionary rule is normally inapplicable to the fruits of foreign searches, but a widely-recognized exception to that principle calls for suppression of evidence seized by foreign authorities if (a) the circumstances surrounding the search shock the judicial conscience, (b) American officials participate in the seizure, or (c) the foreign authorities conducting the search act as agents for their American counterparts. See, e.g., *United States v. Hensel,* 699 F.2d 18, 25 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. (Under Seal),* 794 F.2d 920, 928 (4th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986); *United States v. Morrow,* 537 F.2d 120, 139 (5th Cir. 1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Rose,*

Much of the content of the Department's affidavits is contradicted by concrete evidence identified by the Post. [68] And what-

> 570 F.2d 1358, 1362 (9th Cir.1978). In announcing the applicability of the exclusionary rule to those foreign searches where "the deterrence principle may be deemed to operate," *United States v. Mount,* 244 U.S.App.D.C. 320, 323, 757 F.2d 1315, 1318 (1985), the majority opinion expressed not the slightest reservation regarding judicial competence to make the requisite factual determinations, nor did a concurring opinion questioning whether the "shock the judicial conscience" test was a proper exercise of a court's supervisory powers. *Id.* at 325–329, 757 F.2d at 1320–1324. Indeed, in distinguishing the case to be made for excluding evidence obtained in a foreign search in which Americans participate, *id.* at 325 n. 1, 757 F.2d at 1320 n. 1, or for the general Fifth Amendment infirmities of evidence unreliable because obtained through torture or some other form of physical abuse, *id.* at 329 n. 7, 757 F.2d at 1324 n. 7, the concurrence made clear that doubt about the courts' factfinding capability played no part in its conclusions.
>
> And, lest it be overlooked, we note that appellate courts are regularly summoned to review records underlying orders to deport aliens who seek asylum on the ground of threatened persecution in their homelands—a factual determination involving elements of predictive judgment on foreign conditions strikingly similar to those postulated by the instant case. See, e.g., *INS v. Cardoza–Fonseca,* — U.S. —, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984).

**67.** Dis.Op. at 45.

**68.** See, e.g., Armstrong Affidavit, *supra* note 18, J.App. 153–158; Exhibits 1–3 to Armstrong Affidavit, *supra* note 18, J.App. 159–164 (copies of State Department communications allegedly stolen from the United States embassy in Teheran and widely circulated in Iran); J. Stempel, *supra* note 18, at 166, Exhibit 6 to Armstrong Affidavit, *supra* note 18, J.App. 167, 169; W. Sullivan, *supra* note 18, at 200, Exhibit 7 to Armstrong Affidavit, *supra* note 18, J.App. 170, 171a; *Yazdi Really an American,* Iran Times, Mar. 16, 1979, Exhibit 4 to Armstrong Affidavit, *supra* note 18, J.App. 165; *Foreign Minister Denies Iran Seeks to Export Revolution,* Washington Post, Oct. 4, 1979, Exhibit 5 to Armstrong Affidavit, *supra* note 18, J.App. 166; *U.S. Supreme Court to Decide Yazdi Case,* Iran Times, Nov. 13, 1981, Exhibit E to Affidavit of Paul Mogin Accompanying Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue, *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.) (filed Dec. 19, 1983), R.Doc. 18; *Yazdi to U.S.: Free My Papers,* Iran Times, Dec. 4, 1981, Exhibit 8 to Armstrong Affidavit, *supra* note 18, J.App. 174 (report that Dr. Yazdi, through Iranian Government, re-

ever weight the opinion of the Department, as a presumed expert in the foreign relations field, is able to garner, deference cannot extend to blatant disregard of countervailing evidence.[69] Indeed, it is ironic that the dissent should propose to resolve through "common sense" an issue it claims lies beyond the competence of the judiciary.

The central question in this litigation is one of predictive fact—the expectable consequences of a public release of particular information. Though Congress has conferred "substantial weight" upon agency affidavits only in Exemption 1 cases,[70] the State Department's affidavits in this case are still entitled to careful consideration. But, when, as here, conclusions drawn in agency affidavits are hotly contested by other evidence, both the need for and the propriety of a judicial resolution emerge.

The State Department's affidavits predict that Iranians who have connections with the United States face possible harm. One of two affidavits upon which the Department relies heavily states that "[a]n official of the Government of Iran who is *reputed* to be an American citizen would, in my opinion, be in physical danger from some of the revolutionary groups that are prone to violence."[71] Another affidavit avers that "there continues to be intense anti-American sentiment in Iran and several revolutionary leaders have been strongly criticized in the press for their *alleged* ties to the United States. Any person *suspect-ed* of having such a connection would likely be subject to severe scrutiny, suspicion and possible harm."[72] Yet, as we have noted, there already has been widespread public speculation concerning a relationship between Dr. Yazdi and the United States. There have been published accounts, drawing on sources both within and without the United States Government,[73] that would appear more than sufficient to provoke the reprisals the Department dreads. But, as the District Court observed and neither party has disputed, "the danger anticipated by the affidavits submitted by [the Department] has not materialized. On the contrary, in months following that report, Dr. Yazdi's governmental responsibilities, according to [the Department's] affidavits, were increased."[74] The publicity given Dr. Yazdi's alleged United States citizenship, the fact that he has not been the subject of retaliation, and the further fact that he seemingly enjoys heightened status in the Iranian Government, combine to pointedly controvert the Department's prediction of harm from disclosure of the documents the Post wishes to inspect.

It was not until the Department's motion for summary judgment was filed—four years after the Post's initial FOIA request—that the Department advanced the contention that the threat to Dr. Yazdi arises not so much from unverified information about a United States citizenship as from "official confirmation" thereof.[75]

quested United States to release any information concerning him).

**69.** We have recently adhered to this principle in the Exemption 3 context in which we held that

summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and *if they are not called into question by contradictory evidence in the record* or by evidence of agency bad faith.

*If the agency's statements meet this standard,* the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency.

*Halperin v. CIA, supra* note 26, 203 U.S.App.D.C. at 114, 629 F.2d at 148 (emphasis added) (footnotes omitted). In the instant case, the Depart-

ment's affidavits plainly do not meet this standard.

**70.** See note 60 *supra* and accompanying text.

**71.** *Saunders Affidavit, supra* note 17, at 2, J.App. 19 (emphasis added).

**72.** *Saunders Supplemental Affidavit, supra* note 17, at 2, J.App. 80 (emphasis added).

**73.** See note 68 *supra*.

**74.** *Washington Post Co. v. Department of State, supra* note 5, at 6, J.App. 180.

**75.** See Schneider Affidavit, *supra* note 17, at 6, J.App. 131; see also Affidavit of James A. Placke, *Washington Post Co. v. Department of State,* No. 84–5064, (D.C.Cir.) (filed Sept. 30, 1985). The only concrete examples of harm offered by the Department do not involve any

Certainly under some circumstances official corroboration may have effects qualitatively different from those emanating from unofficial information already publicly known.[76] But whether a particular confirmation likely will produce a more profound effect, or increase an effect beyond a legally acceptable limit, is clearly a question of fact, and as such an appropriate subject of inquiry at an evidentiary hearing.[77]

Moreover, outright deference to the State Department's risk appraisal would ignore the Supreme Court's admonition, in earlier remanding this very case, that "[t]he public nature of information may be a reason to conclude, under all the circumstances of a given case, that the release of such information would not constitute a 'clearly unwarranted invasion of personal privacy.'"[78] Although this "impl[ies] the existence of a low-level privacy interest in ... records *despite* their public availability somewhere in the nation,"[79] it also suggests that the interest fades commensurately with public availability of those

records. We recently recognized that in some cases the dissemination of already-public information may result in "particular harm" to an individual and counsels against disclosure.[80] The existence of "particular harm" in this case, however, depends precisely upon the resolution of an issue of predictive fact, which renders an evidentiary exploration indispensable.

## IV. CONSIDERATIONS ON REMAND

■ For the reasons discussed, we remand this case to the District Court for further proceedings leading eventually to appropriate factfinding should any issue of material fact persist. This remand will serve several highly useful purposes. First, we note that the District Court denied the Post any opportunity for discovery.[81] In FOIA cases, as in other litigation, discovery is an important tool for truth-testing,[82] and each mode of discovery requested by the Post[83] was appropriate in a FOIA action.[84] The Post made known

---

"official confirmation." See text *supra* at notes 71–72.

76. See, e.g., *Abbotts v. Nuclear Regulatory Comm'n*, 247 U.S.App.D.C. 114, 117–118, 766 F.2d 604, 607–608 (1985) (number of terrorists against which nuclear plant is protected); *Miller v. Casey, supra* note 26, 235 U.S.App.D.C. at 15, 730 F.2d at 777 (existence of covert mission); *Military Audit Project v. Casey, supra* note 26, 211 U.S.App.D.C. at 154–156, 656 F.2d at 743–745 (true purpose of top-secret mission).

77. See Part II *supra*. In the instant case, the District Court made known that it was

not persuaded that an official government affirmation or denial of Yazdi's citizenship status will increase the risk of harm or danger.... Reports that Yazdi is an American citizen have already been widely publicized by the press and reputable authors and the Court is not persuaded that disclosure of the records in issue would increase the risk of harm or danger to Dr. Yazdi.

*Washington Post Co. v. Department of State, supra* note 5, at 9, J.App. 183.

78. *Department of State v. Washington Post Co., supra* note 13, 456 U.S. at 602–603 n. 5, 102 S.Ct. at 1962 n. 5, 72 L.Ed.2d at 365 n. 5 (quoting 5 U.S.C. § 552(b)(6) (1982)).

79. *Reporters Comm. for Freedom of the Press v. United States Dep't of Justice, supra* note 42, 259 U.S.App.D.C. at 436, 816 F.2d at 740 (emphasis in original).

80. *Reporters Comm. for Freedom of the Press v. Department of Justice,* 265 U.S.App.D.C. 365, 367, 831 F.2d 1124, 1126 (1987).

81. *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C. Mar. 15, 1984) (order), R.Doc. 37.

82. *Londrigan v. FBI, supra* note 24, 216 U.S.App.D.C. at 356, 670 F.2d at 1175; *Goland v. CIA,* 197 U.S.App.D.C. 25, 43, 607 F.2d 339, 357 (1978) (dissenting opinion), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S. App.D.C. at 206–207, 553 F.2d at 1382–1383; *Weisberg v. Department of Justice,* 177 U.S.App. D.C. 161, 164, 543 F.2d 308, 311 (1976); *Schaffer v. Kissinger,* 164 U.S.App.D.C. 282, 284, 505 F.2d 389, 391 (1974); *Murphy v. FBI,* 490 F.Supp. 1134, 1136–1137 (D.D.C.1980).

83. See, in *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.), Plaintiff's First Set of Interrogatories (filed Feb. 15, 1984), R.Doc. 32; Plaintiff's Request for Production of Documents (filed Feb. 15, 1984), R.Doc. 33; Notice of Deposition of David T. Schneider (filed Feb. 15, 1984), R.Doc. 34.

84. See Fed.R.Civ.P. 56(c); *Londrigan v. FBI, supra* note 24, 216 U.S.App.D.C. at 356, 670 F.2d at 1175 (interrogatories, depositions); *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S.App. D.C. at 207, 553 F.2d at 1383 (interrogatories,

that its discovery efforts were directed toward ascertaining any factual premises for the Department's estimate of resulting harm to Dr. Yazdi, the basis for the Department's assertion that already-public information on Dr. Yazdi's citizenship would not dissipate any such harm, and the Department's role in prior disclosures by certain of its former employees and the Immigration and Naturalization Service.[85] The discovery proposed by the Post thus would have borne directly on the all-important question of potential harm to Dr. Yazdi from release of the documents requested. With these discovery objectives, there is hardly any risk of accidental disclosure of putatively exempted material, a factor that has been crucial to limitations on discovery in other FOIA cases.[86]

After completion of discovery, a hearing might be necessary to evaluate conflicting evidence.[87] The Post should be afforded the opportunity to cross-examine the Department's witnesses and, of course, the Department should enjoy the same option respecting witnesses selected by the Post.[88] Similarly, both sides should be allowed to present the testimony of expert witnesses,[89] and non-experts with first-hand knowledge on the state of affairs in Iran, particularly with respect to attitudes toward Iranians having political connections with the United States.[90]

## V. CONCLUSION

We reverse the District Court's summary judgment in favor of the Post. We also reject the contention that predictive judgments by the State Department on the nature and impact of future behavior of foreign nations and their citizens are inviolate in Exemption 6 proceedings. We direct the District Court to accord the parties full de novo review, and we hold that unless the Department discharges its burden of sus-

---

depositions, requests for admissions); *Weisberg v. Department of Justice, supra* note 82, 177 U.S.App.D.C. at 164, 543 F.2d at 311 (interrogatories, depositions).

**85.** Memorandum in Opposition to Defendants' Motion for a Protective Order, *Washington Post Co. v. Department of State,* Civ. No. 79–2688 (D.D.C.) (filed Mar. 8, 1984), at 4, R.Doc. 26, at 4.

**86.** Cf. *Military Audit Project v. Casey, supra* note 26, 211 U.S.App.D.C. at 158, 656 F.2d at 751; *Lesar v. Department of Justice,* 204 U.S.App.D.C. 200, 216, 636 F.2d 472, 488 (1980); *Common Cause v. National Archives & Records Serv., supra* note 24, 202 U.S.App.D.C. at 186, 628 F.2d at 186. Undue prolongation of the discovery process and any unreasonable burden on the Department can be avoided by adequate supervision.

**87.** See *National Ass'n of Gov't Employees v. Campbell, supra* note 24, 192 U.S.App.D.C. at 376, 593 F.2d at 1030; *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S.App.D.C. at 207, 553 F.2d at 1383.

**88.** *Sears, Roebuck & Co. v. GSA, supra* note 24, 180 U.S.App.D.C. at 207, 553 F.2d at 1383.

**89.** Indubitably, Congress contemplated the use of expert witnesses in FOIA cases, even those involving classified documents. Senator Muskie, who played a key role in securing de novo review of Exemption 1 claims, stated on the Senate floor:

> I am not asking the courts to disregard the expertise of the Pentagon, the CIA, or the State Department. Rather, I am saying that I would assume and wish that the judges give such expert testimony considerable weight. However, in addition, I would also want the judges to be free to consult ... experts in military affairs ..., or experts on international relations ..., or other experts, and give their testimony equal weight. Their expertise should also be given considerable weight.

120 Cong.Rec. 17,024 (1974), *reprinted in* 1974 Source Book, *supra* note 42, at 308.

**90.** There are governmental assessments on potential dangers in Iran for those affiliated with the United States that differ from the proffered by the State Department in this case. See, e.g., *Haftlang v. INS,* 252 U.S.App.D.C. 318, 790 F.2d 140 (1986), involving a rejection by the Board of Immigration Appeals of an Iranian citizen's application for asylum in the United States. The applicant submitted an affidavit citing his family's long association with the Shah of Iran and attesting to his fear of harassment and persecution, as well as letters from Amnesty International, former Iranian military officials, and a director of the Iran American Friendship Foundation. The Board found this evidence insufficient to establish a risk of harm. *Id.* at 322–323, 790 F.2d at 144–145; see also *Shoaee v. INS,* 704 F.2d 1079, 1084 (9th Cir.1983) (asylum denied an Iranian despite ties to American defense establishment, family connections to Shah, and Iranian Government's actions against family).

taining its action,[91] the mandatory disclosure directive of FOIA will require release of documents requested. We remand this case to the District Court for further proceedings consistent with this opinion.

*So ordered.*

BORK, Circuit Judge, dissenting:

The majority's remand for an evidentiary hearing to determine the "fact" of Dr. Yazdi's degree of peril will require a hearing on a question wholly unsuited to the capacities of the judicial process. The facts judges, and juries, find are ordinarily about past events or future harms from past events predicted according to disciplines such as medicine or economics or common sense views of likely outcomes. The "fact" the majority here requires the district court to "find" is not like a determination whether an automobile involved in a collision ran a red light, whether a defendant distributed a controlled substance, or whether business competitors agreed to fix prices. The opportunity for cross-examination, which the majority claims must be afforded appellee, is required for sorting out facts of that sort, not for making political predictions about what might happen to Dr. Yazdi under wholly unknowable circumstances in the future, which is rather like using a trial

to predict the outcome of the next Presidential election.

If an evidentiary hearing is the best method of deciding questions like these, then the State Department and the Central Intelligence Agency ought to use the federal courts and cross-examination to arrive at the "truth" on such questions as what the Ayatollah Khomeini will do next with respect to Iraq or the prospects of dissident factions within Libya. It is improbable that anybody would suppose that the result, whatever it might be, was a finding of "fact." It would be speculation only. The question here is similar: what actions might be taken in the future with respect to a particular individual by the government of Iran, or by any one of a number of political or religious factions, some of them presently unknown, within that turbulent and volatile nation.[1]

The majority requires the Department of State and the Washington Post to have a hearing on the latter "issue," that they cross-examine each other's affiants, and that both sides "present the testimony of expert witnesses, and nonexperts with first-hand knowledge, on the state of affairs in Iran, particularly with respect to attitudes toward Iranians with American ties." Maj. op. at 39.[2] It is difficult to

---

91. See 5 U.S.C. § 552(a)(4)(B) (1982).

1. As the majority notes, this question is, in some respects, similar to the findings of fact made by an immigration officer when an alien attempts to prove (or does prove) that he has a "well-founded fear of persecution" should he return to his native land and thus is entitled to refugee status in this country. 8 U.S.C. § 1101(a)(42)(A) (1982). The asylum procedure mandates that INS request an advisory opinion from the State Department. 8 C.F.R. §§ 208.7(a), 208.10(b) (1987). Judicial review of an INS decision not to grant asylum status is deferential. The decision whether the alien has met the refugee definition is reviewed under the substantial evidence test. The ultimate decision to grant or deny asylum is reviewable only for abuse of discretion. *Espinoza–Martinez v. INS,* 754 F.2d 1536 (9th Cir.1985). Judicial review of an INS determination not to withhold deportation is also limited to substantial evidence review. 8 U.S.C. § 1105a(a)(4) (1982). it is significant that in another area of the law, where "country conditions" are at issue, Congress has limited judicial review.

It is also for these reasons that under the applicable standards the alien "must introduce credible, direct, and specific evidence of facts that would support a reasonable fear of persecution." *Mendez–Efrain v. INS,* 813 F.2d 279, 282 (9th Cir.1987). Aliens, who unlike Dr. Yazdi are present at the hearing, are required to show an individualized threat; a general level of violence or danger is not sufficient. *Id.* Thus, the focus of the INS' evidentiary hearing on refugee status is on individualized facts *not* on general political speculation.

2. I grant the majority's uncontroversial argument that summary judgment is limited to situations where no material facts are in dispute. Maj. op. at 29–31. It is also beyond dispute that the "integrity of a court's de novo judgment rests upon an adversarial system of testing for truth when critical adjudicative facts are in dispute." *Id.* at 31. What the majority blithely ignores, however, is that in this case we are confronted with "facts" which are beyond the capabilities of the adversarial system itself. No amount of adversarial cross-examination will help the district court judge to determine the

know how the district court will try "the state of affairs in Iran" other than to ask whether there is any danger to an Iranian politician who has denied that he is an American citizen and then is shown to be one by the American government. If more than that is proposed, it is not clear what it is. Given the events of the past several years, moreover, it is hard to believe an evidentiary hearing is required to learn Iranian attitudes toward America.

Following the hearing, the majority presumably would have the district court make findings as to what the evidence adduced established. This court will then review, on a clearly erroneous standard, the "findings" about the "state of affairs in Iran," "attitudes toward those with American ties," and what all of this might portend for Dr. Yazdi's continued well being.

The majority seems to completely miss my point that courts do not deal in predictive *political* facts. I agree with the majority that courts can, and should, determine facts involving foreign events and actors. The problem with the "facts" in this case is not that they involve foreigners, acts taking place on foreign soil, or even events taking place in Iran. *See, e.g., Islamic Republic of Iran Broadcasting v. Sotheby Parke–Bernet, Inc.,* 839 F.2d 780 (D.C.Cir.1988) (court upholds a jury's factual determination involving the confiscation of a violin in Iran).

What places this case so totally outside the province of judicial capacity is that the district court is asked to predict *political* events and violence in Iran. While courts are competent to determine issues of predictive fact, I know of no legal principle which allows a court to speculate about future political events and then call its guess a "fact."

One can dress up any sort of political speculation to look like a judicial determination of "facts," but the dress does not alter the reality. Since the world's best intelligence services cannot infallibly predict the occasions and the targets of terror-

ism, it would seem unduly optimistic for the D.C. Circuit to suppose that its trial processes can do so. In truth, what will come out of such a process in the present case will be an uninformed guess by unqualified judges about what might happen to Dr. Yazdi in a nation torn by factional violence, in a culture wholly different from our own, in a political context we do not understand, in a city we have never seen, and that is over 6,000 miles from where we sit.

It is appalling that anyone's life, liberty, or property is to be made to depend on so preposterous a judicial undertaking. The majority fails to acknowledge, even in passing, that the privacy interest asserted here is quite different from the typical Exemption 6 privacy interest. We are not being asked to determine whether disclosure of Yazdi's citizenship status will unduly embarrass him or perhaps cut short a promising career in Iran by damaging his political reputation. Instead the privacy interest asserted is the possibility that physical danger to life and limb will flow from disclosure. Surely there can be no asserted privacy interest graver than the risk of physical harm or loss of life.

No court could conceivably find that Dr. Yazdi will be subject to no danger whatever or that he will certainly be injured. This means that the best a factfinder can honestly attempt is to estimate the odds on injury to Dr. Yazdi and then decide what degree of risk crosses the threshold of an unwarranted "invasion of privacy." That is a most peculiar judicial function. I would have thought any increase in danger to a man's life would cross the threshold. And, as I have suggested, no judge can honestly say that increased danger will not result. It should be enough to support the summary judgment here that neither we nor the trial court can possibly say with any assuredness, with or without a hearing, that releasing the information sought would pose no danger to Dr. Yazdi.

Although FOIA provides that reviewing courts must examine the record *de novo*, 5

---

credibility of the experts called to testify by each side. The most the district court will be able to

determine is that each political expert holds his political opinion sincerely.

U.S.C. § 522(a)(4)(B) (1982), in the particular facts of this case the factors to be considered are so far beyond the competence of the judiciary to assess that according substantial weight to the factual allegations and opinions of the agencies is appropriate. *See, e.g., CIA v. Sims,* 471 U.S. 159, 176, 105 S.Ct. 1881, 1891, 85 L.Ed.2d 173 (1985); *Weissman v. CIA,* 184 U.S.App. D.C. 117, 565 F.2d 692, 697 (1977). Congress specifically recognized this principle with respect to Exemption 1 of the FOIA:[3]

> Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of public disclosure of a particular classified record. Accordingly, [Congress] expect[s] that [f]ederal courts, in making *de novo* determinations in section 552(b)(1) cases under the Freedom of Information law, will accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.

S.Rep. No. 1200, 93d Cong., 2d Sess. 12 (1974), U.S.Code Cong. & Admin.News 1974, p. 6290, *see also* 120 Cong.Rec. 17,024 (1974) (Sen. Muskie) ("[By suggesting *de novo* review in Exemption 1 cases,] I am not asking the courts to disregard the expertise of the Pentagon, the CIA, or the State Department. Rather, I am saying that I would assume and wish that the judges give such expert testimony considerable weight.").

In *Halperin v. CIA,* 203 U.S.App.D.C. 110, 629 F.2d 144 (1980), this court applied the "logic" of Congress' statement with respect to Exemption 1 in its review of a CIA decision not to release the names of attorneys or law firms retained by the CIA to perform legal services connected with classified activities. The CIA claimed that the records were exempt from disclosure under Exemption 3 of the FOIA, which

protects matters that are "specifically exempted from disclosure by statute," 5 U.S. C. § 552(b)(3) (1982). The statute the CIA relied upon was 50 U.S.C. § 403(d)(3) (1976), which provides that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure[.]" The CIA refused to disclose the names sought because, among other reasons, the disclosure could result in harm to the individuals identified and could lead to further disclosure of intelligence sources and methods. We held that the question of "whether the predicted danger is a reasonable expectation ... is precisely ... [the] point that a court, lacking expertise in the substantive matters at hand, must give substantial weight to agency statements, so long as they are plausible and not called into question by contrary evidence or evidence of agency bad faith." *Halperin,* 629 F.2d at 149.

The "logic" of according deference to agency opinions regarding foreign policy and this court's holding in *Halperin* should provide persuasive reason to accord "substantial weight" to the State Department's assessment of the potential harm to Dr. Yazdi from disclosure of the requested information.[4] First, the reasons for deference in foreign policy matters are applicable here, for an estimate of the degree of danger in which disclosure would place Dr. Yazdi depends upon expert knowledge about the internal situation and politics of Iran, matters within the competence of the State Department and far outside ours.

Second, it is anomalous to accord deference to an agency's opinion "that the disclosure of the identity of an attorney doing work for the CIA might expose him to adverse action from hostile powers," *Halperin,* 629 F.2d at 148, but to refuse to accord any deference to an agency's opinion that "[a]n official of the Government of

---

**3.** Exemption 1 protects from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order...." 5 U.S.C. § 552(b)(1) (1982).

**4.** I certainly do not mean to indicate that a court must give deference to every agency opinion in an Exemption 6 case. As I note in the body of the opinion, this case presents a situation quite unlike the typical Exemption 6 privacy interest.

Iran who is reputed to be an American citizen would ... be in physical danger from some of the revolutionary groups that are prone to violence." Affidavit of Harold H. Saunders ¶ 2, J.A. at 19. In both cases the expertise to which we defer is the same: the ability to assess the political climate in a foreign nation and to determine the attendant risk of harm to individuals from disclosure of information regarding those individuals. And, in each case judges "lack the expertise necessary to second-guess such agency opinions." *Halperin,* 629 F.2d at 148.

Application of this standard in assessing Dr. Yazdi's privacy interest reveals that the privacy interest at stake is indeed quite substantial. For example, in describing the situation in Iran in 1980, Harold H. Saunders, then Assistant Secretary of State for Near Eastern and South Asian Affairs, stated that "[a]ny individual in Iran who is suspected of being an American citizen or of having American connections is looked upon with mistrust. An official of the Government of Iran who is reputed to be an American citizen would, in my opinion, be in physical danger from some of the revolutionary groups that are prone to violence." Affidavit of Harold H. Saunders ¶ 2, J.A. at 19. Yazdi was Iran's Foreign Minister but resigned soon after the takeover of the American Embassy in Tehran. He apparently remained a member of the Revolutionary Council for some time. Id. ¶ 3, J.A. at 19. He also sat in the Iranian parliament, *see* Supplemental Affidavit of Harold H. Saunders ¶ 2, J.A. at 80, though at oral argument counsel for the State Department stated his understanding that Yazdi was no longer a member of that body.

In a supplemental affidavit, Assistant Secretary Saunders noted that "[t]here continues to be intense anti-American sentiment in Iran and several revolutionary leaders have been strongly criticized in the press for their alleged ties to the United States [and] any person suspected of having such a connection would likely be subject to severe scrutiny, suspicion and possible harm." Supplemental Affidavit of Harold H. Saunders ¶ 3, J.A. at 80. *See also*

Affidavit of David T. Schneider, Senior Deputy Assistant Secretary of State in the Bureau of Near Eastern and South Asian Affairs: "Individuals ... arrested due to their association with Americans remain in jail"; "There has been no moderation in the anti-American rhetoric of the regime. The U.S. is still called the 'Great Satan'"; "Cumulated evidence points to Iranian involvement in acts of international terrorism, including the attacks on the U.S. Embassy in Beirut and the U.S. Marine barracks in Lebanon"; Dr. Yazdi is "a member of the faction led by Mehdi Bazargan.... This faction is already in danger due to Mr. Bazargan's public criticisms of the regime.... A meeting attended by members of the Bazargan faction was broken up by rioters who entered the building, forcing Bazargan and others to flee through a rear entrance. Dr. Yazdi's association with this faction is well known in Iran as are his relatively moderate politics including a willingness to seek accommodation with the United States." J.A. at 126–32.

These facts justify the affidavit's conclusion that "[i]f Department of State files were to confirm that Dr. Yazdi was a U.S. citizen, which he has reportedly denied, it would have results which constitute a serious threat to his personal privacy, safety, and well being, including arrest and imprisonment." J.A. at 131. It seems clear that Yazdi, who was a prominent Iranian official and who has denied being an American citizen, would be in more than ordinary peril if the American government should declare that, in truth, he is an American citizen. This court is certainly in no position to contradict the State Department's assertions on that subject.

I do not, as the majority asserts, advocate blind deference to the State Department. There is no anomaly in asserting that we should accord substantial weight to the State Department's affidavit while also noting that the conclusions stated in it are plausible. Under the standard enunciated in *Halperin,* the State Department's affidavits should be accorded substantial weight because "they contain reasonable specificity of detail rather than merely con-

clusory statements, and ... they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Halperin*, 629 F.2d at 148.[5] My arguments from plausibility are an appropriate examination for contradictory evidence or bad faith.

The only evidence in the record that could be construed to contradict the Department's affidavits is the previous publication of allegations of Dr. Yazdi's U.S. citizenship and lack of any known subsequent harm to Dr. Yazdi. But, as the State Department contends, it is the *official* confirmation of Dr. Yazdi's citizenship that would result in a serious threat to his safety and well being. It is common knowledge that foreign governments often react much more strongly when facts they already know or suspect are given official confirmation. An authoritative statement from the United States government about a person's American citizenship is certain to be regarded as more credible than unofficial assertions published in the media. Whatever suspicions may have been occasioned by the two books previously mentioned, official confirmation would remove all doubt. And even if no doubt exists among those in Iran who might take action, a public statement by our government may still provoke a reprisal that otherwise would not take place, for an official statement of this sort, unlike media accounts, may be seen by members of a foreign government as requiring a public response to something they would have preferred to ignore.

This circuit has previously noted the distinction between speculation and official acknowledgment. Thus, we have remarked that the Soviet Union had long known of flights of U–2 planes over Soviet territory and knew specifically that a U–2 they had brought down was engaged in gathering intelligence. But it was only when President Eisenhower publicly confirmed those facts and that he had approved the mission that the Soviet Union denounced the American action and cancelled a scheduled summit conference. *See Afshar v. Department of State*, 226 U.S.App.D.C. 388, 702 F.2d 1125, 1130–33 & n. 7 (1983) (citing *Phillippi v. CIA*, 211 U.S.App.D.C. 95, 655 F.2d 1325, 1332 (1981)); *Military Audit Project v. Casey*, 211 U.S.App.D.C. 135, 656 F.2d 724, 743–45 (1981).

In the context of FOIA, this circuit has noted that "[u]nofficial leaks and public surmise can often be ignored by foreign governments ... but official acknowledgment may force a government to retaliate." *Afshar*, 702 F.2d at 1130–31. Although that statement was made about a foreign government's cooperation with U.S. intelligence services, its underlying rationale is applicable here. The distinction between a foreign government's reaction to rumor or speculation and official confirmation is not dependent on the type of information released or the FOIA exemption involved. Instead, reaction to official confirmation takes place "[i]n the world of international diplomacy, where face-saving may often be as important as substance...." *Phillippi*, 655 F.2d at 1333. I believe that under this persuasive precedent, the *Washington Post's* reliance on the impact of widespread speculation about Yazdi's citizenship on his privacy interest is misplaced.

This court should instead give substantial weight to the State Department's allegations that official confirmation of Yazdi's alleged citizenship would subject him to "physical danger" and "severe scrutiny, suspicion and possible harm." It is clear that the Department asserts "threats to privacy interests more palpable than mere possibilities." *Department of the Air Force v. Rose*, 425 U.S. 352, 380 n. 19, 96 S.Ct. 1592, 1608 n. 19, 48 L.Ed.2d 11 (1976).

In the case before us, we have not merely the State Department's informed estimate of the dangers, backed by a factual recounting of events in Iran that is not

---

**5.** *See Hayden v. National Security Agency*, 197 U.S.App.D.C. 224, 608 F.2d 1381, 1387 (1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Goland v. CIA*, 197 U.S.App. D.C. 25, 607 F.2d 339, 352 (1978), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Ray v. Turner*, 190 U.S.App.D.C. 290, 587 F.2d 1187, 1194–95 (1978); *Weissman v. CIA*, 184 U.S.App.D.C. 117, 565 F.2d 692, 697 n. 10 (1977).

disputed, but also an estimate that, as any reader of the Washington Post knows, is very plausible. Very little deference to the State Department's knowledge is required. This court is not asked, on the basis of undisclosed expertise, to believe anything more than common sense alone would suggest. Given the nature of the threat in this case, and the utter inadequacy of the trial process to find the degree of Yazdi's danger, let alone to find that the danger is nonexistent, such an expert assessment, backed by recited facts, should be sufficient. I would grant summary judgment to the Department of State.